THOMPSON, Presiding Judge.
Shannon Wilkinson Smith (“the mother”) appeals from.a June 30, 2014, judgment of the Mobile Circuit Court (“the trial eourt”) modifying the custody; -arrangement established in a previous judgment divorcing Justin Randall Smith (“the father”) and her. In the modification judgment, the trial court changed primary physical custody of the parties’ two children (“the children”) from the mother to the father.
The record indicates the following. The parties were divorced in February 2007. Pursuant to the divorce judgment, the mother and the father were awarded joint legal custody, and the mother was awarded primary physical custody,' of the parties’ two children., In July 2012, the father filed petitions seeking both temporary custody of the children and a custody modification. The mother filed a cross-petition for contempt, asserting that the father was in arrears on his child-support obligation and a petition to modify child support. The mother also,filed a motion seeking the return of the children to her custody. In that motion, -the mother alleged that the father had the children for his summer- *1194 visitation period and that he intended to keep the children in his custody until the hearing on his motion for custody, which had been scheduled for August 9, 2012. (The hearing was continued to August 16, 2012.)
On September 12, 2012, the trial court entered an order incorporating an agreement the parties had reached regarding what they appear to have considered pen-dente lite custody and visitation. Pursuant to the September 12, 2012, order, the parties were to “exercise alternate week visitation.” The mother’s time with the children was to be supervised. The father’s child-support obligation was suspended pending further order of the court.
On December 21, 2012, the father filed a motion for immediate custody of the children. In support of that motion, the father alleged that the mother’s visitation periods were no longer being supervised and noted that the mother’s attorney had withdrawn from the case. The father asserted- that the mother had a history of drag abuse, which was the reason for the supervised visitation. In responsei the mother filed a motion to dismiss. A hearing was held on the motions on March 14, 2013, after which the trial court reaffirmed the terms of the September 12, 2012, order. In a second order, the trial court directed the parties to, among. other things, administer the. children’s medications in accordance with doctors’ orders.
On May 1, 2013, the mother made a written request for an “office conference” with-the trial court. In making the request, the mother stated that, since the entry of the September 12, 2012, order, she had “been unable to exercise her regular role as primary custodial parent,” she had received no child support, and she had “been under restrictions in her possession of her children.” The trial court granted the mother’s request. On May 16, 2013, the trial court entered an order again leaving visitation unchanged and setting the case for a hearing.
Before the scheduled hearing could be held, however, the trial court ordered the mother to submit to a drug test. The father also filed a contempt motion against the niother in which he again alleged that her visitation periods were not being supervised. The mother filed several motions seeking the return of the children, none of which were granted. The mother never filed a petition for a writ of mandamus with this court regarding her interim requests for custody of the children.
The evidentiary hearing in this matter was held in June 2014. The evidence adduced at that hearing indicated the following. The children were 12 and 9 years old at the time of the hearing. When the events leading to the father’s request for a change of custody occurred, the children were students at a Mobile elementary school. School records contained in the record on appeal indicate that the older child had a number of disciplinary problems, including being disruptive in class and fighting with other children and teachers. The older child had been prescribed Adderall, which is used to treat attention deficit/hyperactivity disorder (“ADHD”). The father testified that the older child had ADHD. The school nurse gave the older child his medication at school.
In-2012, the father said, the school nurse contacted him to advise him that, for the previous six weeks, the older child had not received his prescribed medication -at school and that the mother was' not returning the school’s telephone calls. The father testified that he then spoke to the mother, who told him “she was no longer administering medicine through the school.” The father-said that the mother told him she was not giving the child his medications at all because, she said, the *1195 medicine made him “fidget[ ] with his hands and mouth.” The father, whose insurance paid for the child’s medication, said that he reviewed his insurance records and found that the child’s prescriptions were still being filled. The mother then told him that she was crushing the medication and putting it in the older child’s breakfast. However, the father said, the mother then conceded that she was no longer giving the older child the medicine and that she had flushed the remainder of the medicine down the toilet.The father contacted his insurance company again and was told that the child’s prescriptions were still being filled.
In March 2012, the father said, he received another call from the school. Shirley Reed, the head of the school’s cafeteria, contacted the - father to tell him the children often did not have money for lunch. Reed said that she would call the mother, who sometimes would bring lunch money and sometimes “didn’t show up.” Reed said that “probably every lady on my staff’ and she had. lent the children lunch money. Eventually, Reed said, she contacted the father about the problem. He was “very upset,” she said, and came to the school to put money in the children’s account and to assure her the children would not be without lunch money again. Reed said that she had checked her records and that the children have not been without lunch money since she spoke with the father.
The father said that when he asked the mother about her failure to provide lunch for the children, she told him that was not true and that she sent the children with money or a packed lunch every day. The father said that, as a result of his conversation with Reed, he set up an account with the school so that the cost of the children’s lunches were debited from his bank account. Unless the mother sent the children to school with a packed lunch during the weeks she had visitation, the father said, he has paid for their lunches daily since April 1,2012.
■ In his dealings with the school, the father discovered that the mother had not listed him as the children’s parent, and, therefore, he was unable to obtain the children’s records. The mother assured the father she would “take care of it,” the father said. The father was then “added as a friend.” After the father took the parties’ divorce judgment to the elementary school to prove that he had joint legal custody, he said, the school added him as a parent.
The father met with the older child’s teacher and the school principal. ' After that meeting, the father said, he spoke to the mother and told her that the children were going to school unprepared, that they were not studying for tests, and that they were not completing their homework assignments. ’ The father testified that the mother claimed that “was an outright lie.” The father said that, thereafter, he tried to stay in contact with the school about the children.
Erica Dunn, the'younger child’s teacher, corroborated the father’s testimony. She said that she received e-mail from him oh a regular basis but that she did not receive any e-mail, notes, or questions from the mother. Dunn said that the father had attended both' parent/teacher conferences she had scheduled during the school year. Dunn said that the father appeared to be “very involved” with the younger child and asked questions about ways he could help that child with school. Dunn stressed the importance of reading with the child.' The father testified that he read with both children regularly, which, he said, the mother did not do. Dunn said that the father also served as a chaperone on the younger child’s field trip.
*1196 On the other hand, Dunn said, the mother ‘had not attended either of the conferences, although she did attend a class party. Dunn said that she sent weekly emails and weekly bulletins, -but, she said, the e-mail address ■ that the mother had provided to her would not “process” the messages that Dunn had attempted to send. Dunn obtained a corrected address for the mother, but that address did not work either, Dunn said.
In April 2012, the father received a telephone call from Elizabeth Rettig, a longtime friend- of the mother’s. Rettig testified at the hearing that she had become concerned that the mother was abusing prescription drugs and was failing to properly care for the children. Rettig testified that the mother would no longer clean her house and would stay in her pajamas all day. According to Rettig, the mother and she had e-mail conversations in which the mother indicated that she was attempting to buy pain medication and ADHD.medi-cation. Rettig also, testified that she once saw the mother buy pain pills from a stranger.
The mother testified that she and Rettig were no longer friends because, the mother said, she had failed to wish Rettig a happy birthday in March 2012. She denied Rettig’s accusations that she had purchased drugs from a stranger and that she was illegally using prescription drugs. She also denied that she was taking the older child’s ADHD medication. The mother’s cousin, Samantha Clark, testified on behalf of the mother, and she said that Rettig was a “liar.”
■The results of a drug test the mother took in September 2013 were positive for the use of benzodiazepines and methamphetamine. A handwritten notation on the report states “Rx attached.” However, no attachment is included in the record. The mother was to obtain a letter from her physician showing that the positive test results were caused by medication - for which she had a prescription.[1]
Clark, the mother’s cousin, said that the mother is “an excellent mother” who did homework with the children, read'to them, and sang to them when she put them to bed. The mother’s own mother, Mary Manson, also testified that the mother was attentive to the children and that she never had any concerns about the mother’s parenting skills. However, the father testified that when the children came to him after being with the mother, their clothes were dirty and ill-fitting and their hygiene was poor.
Manson said that she had never agreed to supervise the mother’s visitation periods, but she had done so until she moved to North Carolina in February 2014. Manson said that she had spoken with the mother about also moving to North Carolina. The mother acknowledged that she and Manson had such discussions. After Manson moved, the mother obtained permission from the court to allow Chip Fau-sak, in whose home the mother lived at the time of the hearing, to supervise visitation. At the time of the hearing, the mother was married to a man who lives in Fort Myers, Florida. She testified that she worked for two restaurants and a comedy club in the Fort Meyers/Naples area, “run[ning] all of their advertisement, social media, and event coordinating.” However, the-mother said, she lived with Fausak in his three- *1197 bedroom house in Alabama. She testified that she paid rent to Fausak and slept on a pullout couch in the master bedroom. - She denied that they were romantically involved. The mother did not have a residence of her own.
The mother testified that the father did not exercise his weekend visitation with the children until 2010 and that 2012 was the first year he exercised his entire summer -visitation. She also claimed that he was $17,600 in arrears with his child-support obligation.[2] ■
On June 30, 2014, the trial court entered a judgment awarding the father primary physical custody of the children, subject to the mother’s standard visitation. The visitation was conditioned on the mother’s not using any controlled substances, other than those properly prescribed by a physician. The trial court also ordered the mother to pay child support of $430 each month. However, the trial court also found the father in contempt for his failure to pay $17,600 in child support. At the time the judgment was entered, the father had made a payment of $4,800 toward that arrearage. The trial court ordered that the $12,800 balance was to be satisfied by crediting the mother with $430 each month until .the balance was paid, after which the mother was to begin making, monthly payments. ■
The mother timely appealed the modification judgment. On appeal, the mother contends that the “instanter motion procedure” used in this case before the evidentiary hearing violated her right to due process because, she said, “it deprived her of the free exercise of custody of her children without a single shred of evidence proving her unfitness as a parent.” Specifically, the mother claims that, during the two years between the time the father filed his petition for modification and the entry of the final judgment awarding custody of the children, to the father, she was deprived of . the custodial rights granted .to her in the divorce judgment. We note that the mother did not submit a petition for a writ of mandamus to this court asking that we direct the trial court to act more expeditiously in this matter.
The mother acknowledges that she entered into the agreement for the “alternate week visitation,” which was incorporated into the trial court’s September 12, 2012, order. However, she says, she sought to have that order vacated “no less than three times.” As mentioned, the trial court held hearings on the mother’s motions to regain custody, and, each time, it entered an order leaving in place the September 2012 order. The mother also complains that “[tjhere is not a single case in the State of Alabama that delineates the procedure that' should be followed in ‘instanter’ cases.” Therefore, she says, there is no authority for her[1] to cite in support of her argument that the procedure followed in this case deprived her of due process.
*1198 The mother’s argument is without merit. First, we note that the mother never raised this issue in the trial court. It is well settled that an appellate court cannot consider arguments raised for the first time on appeal; rather, appellate review is restricted to the evidence and arguments considered by the trial court. Ex parte Jackson Hosp. & Clinic, Inc., 167 So.3d 324, 336 (Ala.2014); Andrews v. Merritt Oil Co., 612 So.2d 409, 410 (Ala.1992). Even constitutional issues must first be raised at the trial-court level and will not be considered for the first time on appeal. S.J. v. Limestone Cnty. Dep’t of Human Res., 61 So.3d 303, 306 (Ala.Civ.App.2010).
Furthermore, her assertion that she cannot cite any authority in support of her argument that her due-process rights weré violated is disingenuous. There is a plethora of Alabama cases dealing with due process 'that the mother could have used in crafting a legal argument. The mother’s argument as to this issue consists of four paragraphs — about "a page and a half in her brief — and contains no actual legal argument. It is well settled that an appellate court
“will not ‘create legal arguments for a party based, on undelineated general propositions .unsupported by authority or argument.’ Spradlin v. Spradlin, 601 So.2d 76, 79 (Ala.1992). Further, it is well settled that “ ‘[wjhere an appellant fails to cite any authority for an argument, this Court may affirm the judgment as to those issues, for it is neither this Court’s duty nor its function to perform all the legal research for an appellant.’ ” Spradlin v. Birmingham Airport Auth., 613 So.2d 347, 348 (Ala.1993) (quoting Sea Calm Shipping Co., S.A. v. Cooks, 565 So.2d 212, 216 (Ala.1990)).”
Allsopp v. Bolding, 86 So.3d 952, 960 (Ala.2011). Accordingly, we will not consider this issue.
The mother next contends that the trial court improperly admitted what she characterized as prejudicial e-mails and text messages. The e-mails and text messages at issue include the ■ mother’s alleged “unlawful drug requests.” The mother denied sending the messages at issue, and she asserts that the father failed to properly authenticate the e-mails and text messages as required by Rule 901, Ala. R. Evid.
“ ‘ “The standard applicable to a review- of a trial court’s rulings on the admission of evidence is determined by two fundamental principles. The first grants trial judges wide discretion to exclude or to admit evidence.” ’ Mock v. Allen, 783 So.2d 828, 835 (Ala.2000) (quoting Wal-Mart Stores, Inc. v. Thompson, 726 So.2d 651, 655 (Ala.1998))....
“ ‘ “The second principle ‘is that a judgment cannot be reversed on appeal for an error [in the impx-oper admission of evidence] unless ... it should appear that the error complained of has probably injuriously affected substantial rights of the parties.’ ” ’ Mock, 783 So.2d at 835 (quoting Wal-Mart Stores, 726 So.2d at 655, quoting in turn Atkins v. Lee, 603 So.2d 937, 941 (Ala.1992)). See also Ala. R.App. P. 45. ‘The burden of establishing that an erroneous ruling was prejudicial is on the appellant.’ Preferred Risk Mut. Ins. Co. v. Ryan, 589 So.2d 165, 167 (Ala.1991).”
Middleton v. Lightfoot, 885 So.2d 111, 113-14 (Ala.2003).
Culp v. State, 178 So.3d 378, 384 (Ala.Crim.App.2014), is the only opinion of an Alabama appellate court in which the proper authentication of e-mails is addressed. In Culp, the Alabama Court of Criminal
*1199 Appeals did a thorough review of opinions from other jurisdictions that had already addressed the issue. The Culp court wrote:
“In State v. Koch, 157 Idaho 89, 334 P.3d 280 (2014), the Idaho Supreme Court considered for the first time the foundational requirements • for admitting emails. The Court wrote:
“ ‘Because Idaho Rule of Evidence 901 is based on Federal Rule of Evidence 901, how other jurisdictions have interpreted the federal rule’s requirements with regard to the admission of e-mails and text messages is instructive in this case. Other jurisdictions have recognized that electronic evidence may be authenticated in a number of different ways consistent with Federal Rule 901 and corresponding state statutes. Courts have not required proponents offering printouts of e-mails," internet chat room dialogues, and cellular phone text messages to authenticate them with direct evidence, such as an admission by the author or the testimony of a witness who saw the purported author typing the message. See, e.g., United States v. Fluker, 698 F.3d 988, 999 (7th Cir.2012). Rather, courts have held that circumstantial evidence establishing that the evidence was what the proponent claimed it to be was sufficient. See, e.g., State v. Thompson, 777 N.W.2d 617, 624 (N.D.2010) (providing a comprehensive review of other jurisdictions’ authenticity requirements for electronic communications). ' Circumstantial proof might include the e-mail-address, cell phone number, or screen name connected with the message; the content of the messages, facts included within the text, or style of writing; and me-tadata such as the document’s size, last modification date, or the computer IP address. See Fluker, 698 F.3d at 999; United States v. Siddiqui, 235 F.3d 1318, 1322-1323 (11th Cir.2000); United States v. Safavian, 435 F.Supp.2d 36, 40-41 (D.D.C.2006).
« (
“ ‘While direct evidence is not required to authenticate a text message or e-mail, most jurisdictions require something more than just confirmation that the number or e-mail address belonged to a particular person. See, e.g., In re F.P., 878 A.2d 91, 93-95 (Pa.Super.Ct.2005) (instant messages properly authenticated through circumstantial evidence including screen names and context of messages and surrounding circumstances); Commonwealth v. Williams, 456 Mass. 857, 926 N.E.2d 1162 (2010) (admission of MySpace message was error where proponent advanced no circumstantial evidence as to security of MySpace. page or purported author’s exclusive access). Often it was important that there be evidence that the e-mails, instant messages, or text messages themselves contained factual information or references unique to the parties involved. For example, in Safavian the District of Columbia federal district court held that e-mail messages were properly authenticated where the e-mail addresses contained distinctive characteristics including the name of the person connected to the address, the bodies of the messages contained a name of the sender or recipient, and the content of the emails further authenticated them as being from the purported sender to the purported recipient. 435 F.Supp.2d at 40.’
“157 Idaho at 97, 334 P.3d at 287-88.
“In Pavlovich v. State, 6 N.E.3d 969 (Ind.Ct.App.2014), the Court of Appeals *1200 of Indiana addressed a claim that the trial court had erroneously admitted emails that had not been properly authenticated:' '
• “ ‘Pavlovich contends that the text and e-mail messages were not properly authenticated as having been written by him. “To lay a foundation for the admission of evidence, the proponent of the evidence must show that it has been authenticated.” Hape v. State, 903 N.E.2d 977, 989 (Ind.Ct.App.2009), trans. denied. This authentication requirement applies to the substantive content of text messages purported to be sent by a party. See id. Under Indiana Evidence Rule 901(a) as it existed at the time of Pavlovich’s trial, authentication of evidence was “satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.” “Absolute proof of authenticity is not required.” Fry v. State, 885 N.E.2d 742, 748 (Ind.Ct.App.2008), trans. denied. The proponent of the evidence needs to establish only a reasonable probability that the document is what it is claimed to be. Id. Once this reasonable probability is shown, any inconclusiveness regarding the éxhibit’s connection with the events at issue goes to the exhibit’s weight, not its admissibility. Id. Additionally, authentication of an exhibit can'be established by either direct or circumstantial evidence. Newman v. State, 675 N.E.2d 1109, 1111 (Ind.Ct.App.1996).

U (

“‘At the time of Pavlovich’s trial, Indiana Evidence Rule 901(b)(4) provided that evidence could be authenticated by “[distinctive characteristics and the like,” including “[a]pperance [sic],1, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances.” This language is very similar to Federal Rule of Evidence 901(b)(4). In what has been described as a “watershed” opinion with respect to authentication of text and e-mail messages, the United States District Court of Maryland stated that “[t]his rule is one of the most frequently used to authenticate e-mail and other electronic records.” Lorraine v. Markel Am. Ins. Co., 241 F.R.D. 584, 546 (D.Md.2007). Quoting the official commentary to this rule, the Lorraine court observed:
“ ‘ “ ‘[t]he characteristics of the offered item itself, considered in the light of circumstances, afford authentication techniques in great variety,’ including authenticating an exhibit by showing that it came from a ‘particular person by virtue of its disclosing knowledge of facts known peculiarly to him,’ or authenticating ‘by content and circumstances indicating it was in reply to a duly authenticated’ document.”
“‘Id. In other words, “[u]se of this rule often is characterized as authentication ■ solely by ‘circumstantial evidence.’ ” Id.
“ ‘The Texas Court of Criminal Appeals has noted the various ways in which text ’ or e-mail messages have been adequately authenticated as having been written by a party:
“ ‘ “In some cases, the purported sender actually. admitted to authorship, either in whole or in part, or was seen composing it. In others, the business records of an internet service provider ora cell phone company have shown that the message originated with the purported sender’s personal computer or cell phone under circum *1201 stances in which it is reasonable to believe that.only the purported sender would have had access to the computer or cell phone. Sometimes the communication has contained information that only the purported sender could be expected to know. Sometimes the purported sender has responded to an exchange of electronic, communications in such a way as to indicate circumstantially that he was in fact the author of the particular communication, the authentication of which is in issue. And sometimes other circumstances, peculiar to the facts of the particular case, have -sufficed-to establish at least a prima facie showing of authentication.”
“ ‘Tienda [v. State ], 358 S.W.3d [633] at 640-641 [ (Tex.Crim.App.2012) ] (footnotes and citations omitted). See also People v. Downin, 357 Ill.App.3d 193, 293 Ill.Dec. 371, 828 N.E.2d 341, 350-351 (2005) (holding e-mails were adequately authenticated as being written by defendant where victim personally knew defendant, had communicated previously with defendant through e-mail, defendant was responsive to victim’s e-mail message, and email contained information that would have been known exclusively to him; although ermails were adequately authenticated and admissible, ultimate question of authorship was for trier of fact to decide), app. denied; Commonwealth v. Amaral, 78 MassApp.Ct. 671, 941 N.E.2d 1143, 1146-1147 (2011) (holding e-mails were adequately authenticated where in one, defendant indicated he would be at a certain place at a certain time and he in fact appeared at that place and time, and in another e-mail he provided a telephone number, which investigating officer immediately called and defendant answered), rev. denied; In re F.P., 878 A.2d 91, 95 (Pa.Super.Ct.2005) (holding instant messages were adequately authenticated as having been-written by defendant where defendant referred to his- name and made threats and discussed events related to matters about which victim testified); Manuel v. State, 357 S.W.3d 66, 77-78 (Tex.App.2011) (holding text messages were adequately authenticated as being written by defendant where stalking victim recognized the number from which messages originated as belonging to defendant, and victim also received voice mail messages from number and she recognized the defendant’s voice), retí, refused.’ '
“Pavlovich, 6 N.E.3d at 976-77 (footnotes omitted). The Court of Appeals of Indiana held that the e-mails ‘were properly introduced into evidence and authenticated as having been written by Pavlovich.’ 6 N.E.3d at 980.
“Rule 901(b)(4); Ala. R. Evid, is worked identically to its federal counterpart, as well as, the versions in Idaho and Indiana. Like federal Rule 901(b)(4), Idaho’s Rule 901(b)(4), and Indiana’s Rule 901(b)(4), Alabama’s Rule 901(b)(4) provides that evidence can be authenticated by ‘[distinctive characteristics and the like,’ including ‘[a]ppearance, - contents, substance,’ internal- patterns, or •other distinctive characteristics, taken in conjunction with circumstances.’ In the Advisory Committee’s Notes pertaining to this subsection, the Advisory Committee’s Notes to the federal rule-are referenced, as is Alabama common law.”
178 So.3d at 384-87.
The e-mails and text messages that the mother challenges purportedly involve the mother’s asking Rettig for prescription pain medications. During the mother’s testimony, the father’s attorney asked her *1202 whether she had sent text messages to Rettig requesting Lortab, a controlled substance. The mother said that she had not done so. The father’s attorney showed the mother, a printout of the alleged text messages. One. of the parties to the text-message conversations was “Shannon,” using a telephone number, which the mother admitted was hers, with an “unknown ■ email.” The mother denied that the sender’s e-mail address was Rettig’s.
The trial court would not admit the packet of e-mails or text messages on that basis alone, so the father’s attorney recalled Rettig as a witness. Rettig testified that the e-mails or text messages were sent between the mother and her. After Rettig’s testimony, the trial court admitted the e-mails and text messages. The messages submitted include text or e-mail “conversations” that occurred between 2011 and 2012. The conversations cover a wide range of topics, ranging from the baptism of Rettig’s child, to a discussion of the verdict in the Casey Anthony trial on July 5, 2011, to mundane daily chores or shopping. Interspersed in some of the conversations are requests from the mother to Rettig for various'prescription pain medications, money, soft drinks, and numerous 'other items. ■ The two make plans to get together for coffee, to go out to lunch; to meet at one another’s houses, and the like. The two clearly respond to each other’s messages. This court has reviewed the packet of e-mails and text messages (some of which are duplicates), and the tone, syntax, appearance, and other characteristics over months’ worth of conversations remain consistent. Based on the totality of. the e-mails and the text messages and the circumstances under which they were sent, i.e., casual conversations between friends, we are of the opinion that sufficient circumstantial evidence exists to support the trial court’s 'determination that the e-mails and text messages were admissible.
Even if the e-mails and text messages should not have been admitted, however, we find that such an error would be harmless. Rettig testified without objection that the mother had asked her for prescription pain medication and that she had witnessed the mother purchase drugs illegally from a stranger. The requests in the challenged messages for prescription pain medications were cumulative of Ret-tig’s testimony regarding the same purported facts. The mother denied Rettig’s statements, she’ was able to cross-examine Rettig regarding those statements, and she presented a witness who characterized Rettig as a “liar.” When the evidence is presented to the trial- court ore tenus, it is the trial court’s duty to determine the weight and credibility of the witnesses and their testimony. See Ex parte Hayes, 70 So.3d 1211, 1215 (Ala.2011); Wheeler v. Marvin’s, Inc., 593 So.2d 61, 63 (Ala.1991). Therefore, even if the admittance of the emails and text messages had constituted error, that error would not have injuriously affected the mother’s substantial rights. Accordingly, any such error would have been harmless. MAT Sys., Inc. v. Atchison Props., Inc., 54 So.3d 371, 377 (Ala.Civ.App.2010) (erroneous admission of evidence that is merely cumulative is harmless error); and Rule 45, Ala. R.App. P.
Additionally, in her brief, the mother argues that the way the e-mails and text messages at issue should have been authenticated was by subpoenaing the telephone records for the “sending phone” to see if the records reflect a message having been sent to the “receiving phone” at the same time. She cites no law for that proposition. There is no language in Culp, which the mother cites in support of her contention that the e-mails and text messages were not properly authenticated, that advocates such an action. We decline to adopt the mother’s method of authenticating e-mails and text messages.
*1203 In a two-paragraph argument, the mother asserts that the trial court failed to “discuss” the standard set forth in Ex parte McLendon, 455 So.2d 863 (Ala.1984), in its judgment modifying custody in favor of the father.' Citing Rich v. Rich, 887 So.2d 289 (Ala.Civ.App.2004), the mother contends that, because the trial court failed to set forth the standard it used when ordering the modification, we are required to remand the cause for the trial court to identify the standard it applied.
There is no requirement that a trial court specify in its judgment the standard it applied in determining whether to modify custody. Rich does not stand for that proposition. In Rich, one of the issues before the trial court was whether the McLendon standard applied in that , case. After the modification judgment was entered, the father in that case filed a post-judgment motion arguing that the trial court had failed to apply the McLendon standard. In denying the postjudgment motion, the trial court made no mention of the standard used in determining the custody modification, and it did not address the father’s contention that the McLendon standard was the applicable standard. Rich, 887 So.2d at 296. The postjudgment order seemed to indicate that the trial court did not apply the McLendon standard in reaching its decision to modify custody. Id. at 296-97. This court determined that the McLendon standard was applicable in Rich, adding: “[I]t is not sufficiently clear to us, however, whether the trial court applied that standard.- The case therefore must be remanded to allow the trial court to do so.” Id. at 301.
In this case, the mother has not argued that the trial court actually applied the wrong standard; in fact, nowhere in her brief does she claim that the father did not meet the McLendon standard, i.e., that he failed to demonstrate that a material change in circumstances has occurred since the entry of the previous- judgment, that the children’s best interests will be materially promoted by a change of custody, and that the benefits of that change in custody will more than offset the inherently disruptive effect resulting from the change. Ex parte McLendon, 455 So.2d at 866. Instead, she argues only that the trial court erred in not explicitly stating the standard it applied in modifying custody.
Moreover, we note that “[t]rial court judges are presumed to know the law.” J.F.S. v. Mobile Cnty. Dep’t of Human Res., 38 So.3d 75, 78 (Ala.Civ.App.2009) (citing Ex parte Atchley, 936 So.2d 513, 516 (Ala.2006)). The mother has not provided this court with any basis for believing that the trial court applied an improper standard. The mother has failed to demonstrate error as to this issue.
The mother also contends that the trial court “should not have allowed testimony of [the older child] without proper qualification of [that] minor child as a witness.” She cites no relevant authority for her contention. Accordingly, we will not consider this issue. Allsopp, 86 So.3d at 960.
The mother next asserts that the trial court improperly awarded the father custody of the children in light of what she says was evidence indicating that the father had physically abused the older child. She claims that the trial court failed to apply §§ 30-3-131 and 30-3-133, Ala.Code 1975, which provide for a rebuttable presumption that it is detrimental to a child and not in the child’s best interest to be placed in the custody of the. perpetrator of domestic violence. In its judgment, the trial court did not make a finding of domestic violence.
The mother bases her argument on her contention that the father “struck the [old *1204 er] child hard enough to leave a red hand print visible several hours later.” Clark, the mother’s cousin and a licensed practical nurse who testified on behalf of the mother, attempted to testify regarding three photographs of the older child. The photographs depicted a reddened area on the-older child’s left shoulder, neck, and upper chest. However, Clark’s testimony regarding what she believed was the cause of - the red mark was stricken from the record. When asked about the reddened area during his testimony, the father said that the older child on occasion suffered from heat rash when he played baseball.
The older child testified about an incident that occurred when he had an argument with the father at batting practice. The older child said that the father threw the baseball and accidentally hit the older child with it. The older child said that he started to run to the ear but that the father “grabbed me so I — don’t run to the car.” The older child said that he remembered having his photograph taken after-wards. When asked what the photograph, showed, the oldér child said “a hand print.”
In the mother’s statement of facts in her appellate brief, the mother states that the older child testified that the red marks “indicated] a violent incident between the father and young son.” In the argument portion of her brief, the mother’ states that “[i]t was not disputed that the [father] during a physical confrontation with the [older] child, struck the [older] child hard enough to leave a red hand print visible several hours later.”
The mother’s brief mischaracterizes the evidence. The father denied that a “violent incident” occurred; The older child said that the father’s hitting him with the baseball was an accident. Also, the older child did not say that the father struck him; instead, his testimony indicates that the father grabbed him on the shoulder to prevent him from running off. When evidence is disputed, it is the trial court’s duty to weigh the credibility of the witnesses and make findings of fact. See Ex parte Hayes, 70 So.3d at 1215. Moreover, nothing in the older child’s testimony can be construed as a description .of a “violent incident” between the older child and the father. Even if the photographs depict a hand print rather than heat rash, the evidence simply does not support the mother’s conjecture that the father struck the older child in a violent incident. Accordingly, we conclude that the trial court’s decision not to apply the presumptions in §§ 30-3-131 and 30-3-133, Ala.Code 1975, is supported by the record on appeal. The mother has failed to demonstrate error as to this issue.
Next, the mother contends that the trial court did not have the authority to offset the father’s child-support arrear-age with the future child support she was ordered to pay to the father in the modification judgment. She has offered no authority in support of that contention; therefore, this issue is waived on appeal. Allsopp, 86 So.3d at 960.
Finally the mother argues, correctly, that the trial court erred by failing to award interest on the father’s past-due child support. This issue was not raised before the trial court, however. In her postjudgment motion, the mother argued that the trial court should have required the father to pay the arrearage in full rather than ■ allowing the mother to withhold the amount of monthly child support she had been ordered to pay the father until the balance of the father’s arrearage was paid. She did not raise the issue of interest owed on the arrearage, however.
As mentioned, it is well settled that an appellate court cannot consider arguments raised for. the first time on appeal; rather, appellate review is restricted to the evidence and arguments considered by the trial court. Ex parte *1205 Jackson Hosp. & Clinic, Inc., 167 So.3d at 336; Andrews v. Merritt Oil Co., 612 So.2d at 410. “This court will not hold a trial court in error ‘unless that court has been apprised of its alleged error and has been given the opportunity to act thereon.’ Sea Calm Shipping Co. v. Cooks, 565 So.2d 212, 216 (Ala.1990).” Greener v. Killough, 1 So.3d 93, 101 (Ala.Civ.App.2008); see also Goodyear Tire & Rubber Co. v. Wilson, 113 So.3d 671, 675 (Ala.Civ.App.2012). Because the mother never argued to the trial court that she was entitled to interest on the amount of the father’s child-support arrearage, the judgment, insofar as. it failed to address this issue, is affirmed.
The mother has failed to demonstrate reversible error as to any of the issues raised. For the reasons set forth above, the judgment of the trial court is affirmed.
AFFIRMED.
PITTMAN, THOMAS, MOORE, and DONALDSON, JJ., concur.

. We note that in the June 30, 2014, modification judgment, the trial court ordered that the results of the drug test be sealed; howevdr; after considering the mother’s postjudgment motion, the trial court entered an order stating that "the [mother’s] motion to alter, amend or vacate is granted in part. The [mother's] drug test results in this causé shall be unsealed.”

. Rule 28(a)(7), Ala. R.App. P., states that an appellate brief is to contain "[a] full statement of the facts relevant to the issues presented for review.” ' At best, the mother’s statement of the facts barely meets that requirement. Rather than include a narrative summary of the facts, the mother’s brief sets forth "summaries” of each witness's testimony. After reviewing the record in its entirety, we conclude that the mother’s summarizations are inadequate to provide this court with an accurate portrayal of the full evidence presented. For example, • the summary of the mother’s own testimony as set forth in the statement of the facts is as follows:
“The mother of the children testified on her own behalf. There is nothing in her testimony that you would not expect from a mother of small children that she had cared for and provided for during the extended absence of the father of the children.”