Rel: June 27, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# Alabama Court of Criminal Appeals

## OCTOBER TERM, 2024-2025

————————————————

### CR-21-0275

————————————————

**Donnie Lee Abernathy**

**v.**

**State of Alabama**

**Appeal from Cherokee Circuit Court**
**(CC-16-254, CC-16-255, CC-16-256, and CC-16-257)**

MINOR, Judge.

A jury convicted Donnie Lee Abernathy of two counts of capital murder and one count each of attempted murder, first-degree criminal mischief, and attempting to elude. Abernathy waived his right to jury participation in sentencing on his capital-murder convictions. The

Cherokee Circuit Court sentenced Abernathy to death for both capital-murder convictions, to life imprisonment for the attempted-murder conviction, to 10 years' imprisonment for the criminal-mischief conviction, and to 1 year in prison for the attempting-to-elude conviction. After careful review, and with the benefit of oral argument, we affirm.

## FACTS AND PROCEDURAL HISTORY

On the evening of November 15, 2015, Abernathy broke into a house in Cedar Bluff, kidnapped Jerrica Hamilton, and shot and killed Hamilton's 71-year-old grandmother Sylvia Sue Duffe, Duffe's 68-year-old sister Clara Edwards, and Edwards's 49-year-old daughter Pamela Oshel. Abernathy also shot John McClung and crashed his vehicle into a car driven by a law-enforcement officer who was chasing Abernathy. Law-enforcement officers apprehended Abernathy within minutes of the crimes.

In its order sentencing Abernathy to death, the trial court summarized the evidence from Abernathy's trial:

> "On or about November 15, 2015, Donnie Abernathy and Jerrica Hamilton were in the middle of a custody dispute regarding their biological child. Jerrica Hamilton was living with her grandmother, Sue Duffe, in Cedar Bluff, Cherokee

2

County, Alabama.[1] Also living in the same house was John McClung. On that same day—November 15, 2015—Clara Edwards (Sue Duffe's sister) and Pam Oshel (Clara Edwards's daughter) traveled from Iowa to Cedar Bluff, Alabama, to help care for the minor child and provide support to Ms. Hamilton.[2] That night, around midnight, Abernathy entered the residence of Jerrica Hamilton. Hamilton was awakened from her sleep by Abernathy poking her in the ribs and telling her to 'get up' and 'be quiet.' Sharing a room that night with Hamilton was Pam Oshel. During the interaction between Abernathy and Hamilton, Oshel was also awakened. Hamilton testified that when Oshel was awakened and saw Abernathy in the room, Oshel instantly grabbed her phone. It was at this time Abernathy shot and killed Oshel.

"While Abernathy was shooting Oshel, Hamilton ran out of her room and entered her grandmother's room. While in her grandmother Sue Duffe's room, Hamilton called 911. That call was made at approximately 12:05 a.m. on November 16, 2015. At the same time, while in Duffe's room, Hamilton heard two more gunshots outside of the bedroom, immediately followed by a scream from Clara Edwards. Edwards was later found dead with two gunshot wounds. After killing Clara Edwards, Abernathy continued through the house.

"John McClung had been awakened by the gunshots and

---

[1]Because Hamilton was essentially blind and required dialysis, her testimony was taken by deposition in September 2021 in Iowa, with a prosecutor and Abernathy's counsel present. The trial judge was present via Zoom videoconferencing. The parties stipulated to admitting into evidence a video recording and transcript of Hamilton's deposition.

[2]Duffe's ex-husband Larry Cooke owned the house. When Cooke's health began to decline, he asked McClung to move in and take care of the residence. When Cooke died, McClung contacted Duffe, who traveled to Alabama from Iowa to make burial arrangements for Cooke. Edwards traveled with Duffe. Oshel arrived at the house on November 15, 2015.

screams. McClung testified that he initially believed the gunshots and screams to be a television that had been left on with the volume turned up too loud. As the shots and screams continued, he recognized the screams and realized it was not a television. McClung testified that he exited his room and met Abernathy coming around a corner in the hallway. He recognized and identified Abernathy. Abernathy then shot McClung. McClung would survive his injuries.

"After killing Clara Edwards and attempting to kill John McClung, Abernathy then entered Duffe's room where he proceed to shoot and kill Sue Duffe. Jerrica Hamilton testified that after killing Duffe, Abernathy grabbed her and drug her out of the bedroom to the back door. After exiting the back door, Abernathy forced Hamilton to a golf cart. Evidence introduced at trial indicated that Abernathy intended to use the golf cart to transport him and Hamilton to a vehicle Abernathy had parked in a clearing in the woods approximately six-tenths of a mile away. After the golf cart failed to operate correctly, Abernathy pointed the loaded pistol to the head of Hamilton and ordered her to start walking. Abernathy and Hamilton walked to the vehicle that had been parked in the woods by Abernathy. Once they entered the vehicle, Abernathy demanded that Hamilton call 911 again and tell the operator that the previous 911 call was made by mistake. By this time, numerous police cars were responding to the crime scene. From his position in the woods, Abernathy could see the flashing emergency lights of each police car. Believing the coast was clear, Abernathy pulled out of the woods and onto the road. Upon entering the road, he encountered Deputy Brent Snead who was arriving to the scene. Deputy Snead activated his emergency lights, and Abernathy accelerated and struck Deputy Snead's vehicle on the driver's side.

"A car chase ensued in which Abernathy eventually lost control of the vehicle, crashing into a tree. Abernathy was removed from the vehicle by law enforcement. A .22-caliber

4

pistol, later identified by forensic experts as the murder weapon, was located inside the vehicle."

(C. 3192-94.)

A grand jury indicted Abernathy in September 2016 for attempted murder, see § 13A-4-2 and § 13A-6-2, Ala. Code 1975 (case no. CC-16-254); first-degree criminal mischief, see § 13A-7-21(a)(1), Ala. Code 1975 (case no. CC-16-255); and two counts of capital murder, one count for the murder of two or more persons pursuant to one scheme or course of conduct, see § 13A-5-40(a)(10), Ala. Code 1975, and one count for murder during a first-degree kidnapping, see § 13A-5-40(a)(1), Ala. Code 1975 (case no. CC-16-256). Abernathy was charged by complaint with attempting to elude, see § 13A-10-52, Ala. Code 1975 (case no. CC-16-257), and that case was transferred to the circuit court. See § 12-11-30, Ala. Code 1975, and Rule 2.2, Ala. R. Crim. P. At his arraignment, Abernathy pleaded not guilty or not guilty by reason of mental disease or defect.[3]

At trial, the jury found Abernathy guilty of all five charges. With the consent of the State, his trial counsel, and the trial court, Abernathy

---

[3]At trial, Abernathy did not pursue a defense of not guilty by reason of mental disease or defect.

waived his right to jury participation in sentencing for his capital-murder convictions. See § 13A-5-44(c) and § 13A-5-46(a), Ala. Code 1975. The trial court sentenced Abernathy to death for both capital-murder convictions, to life imprisonment for the attempted-murder conviction, to 10 years' imprisonment for the criminal-mischief conviction, and to 1 year in prison for the attempting-to-elude conviction.

## STANDARD OF REVIEW

Most of the issues Abernathy raises seek plain-error review.

> "Rule 45A, Ala. R. App. P., was amended on January 12, 2023, to state:

> > "'In all cases in which the death penalty has been imposed, the Court of Criminal Appeals may, but shall not be obligated to, notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.'

> "Before Rule 45A was amended, this Court was required to conduct plain-error review in all cases in which the death penalty had been imposed. Although Rule 45A now provides that plain-error review is discretionary in such cases, this Court has explained that it will continue to conduct plain-error review in all cases in which the death penalty has been imposed. Iervolino v. State, 402 So. 3d 845, 861-62 (Ala. Crim. App. 2023). However, that does not mean that this Court will provide a detailed analysis, or even any analysis, of those

6

claims that were not properly preserved for appellate review, as it historically did when plain-error review was mandatory. Id.

"The standard this Court employs in conducting plain-error review is well settled:

"'"'The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal.' Hall v. State, 820 So. 2d 113, 121 (Ala. Crim. App. 1999), aff'd, 820 So. 2d 152 (Ala. 2001). Plain error is 'error that is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.' Ex parte Trawick, 698 So. 2d 162, 167 (Ala. 1997), modified on other grounds, Ex parte Wood, 715 So. 2d 819 (Ala. 1998). 'To rise to the level of plain error, the claimed error must not only seriously affect a defendant's "substantial rights," but it must also have an unfair prejudicial impact on the jury's deliberations.' Hyde v. State, 778 So. 2d 199, 209 (Ala. Crim. App. 1998), aff'd, 778 So. 2d 237 (Ala. 2000). 'The plain error standard applies only where a particularly egregious error occurred at trial and that error has or probably has substantially prejudiced the defendant.' Ex parte Trawick, 698 So. 2d at 167. '[P]lain error must be obvious on the face of the record. A silent record, that is a record that on its face contains no evidence to support the alleged error, does not establish an obvious error.' Ex parte Walker, 972 So. 2d 737, 753 (Ala. 2007). Thus, '[u]nder the plain-error standard, the appellant must establish that an obvious, indisputable error occurred, and he must establish that the error adversely affected the outcome of the trial.' Wilson v. State, 142 So.

7

3d 732, 751 (Ala. Crim. App. 2010). '[T]he plain error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."' United States v. Young, 470 U.S. 1, 15, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985) (quoting United States v. Frady, 456 U.S. 152, 163 n.14, 102 S. Ct. 1584, 71 L. Ed. 2d 816 (1982))."'

"Iervolino, 402 So. 3d at 861-62 (quoting DeBlase v. State, 294 So. 3d 154, 182-83 (Ala. Crim. App. 2018))."

Henderson v. State, [Ms. CR-21-0044, May 3, 2024] ___ So. 3d ___, ___

(Ala. Crim. App. 2024).

## GUILT-PHASE ISSUES[4]

## I. NO TRANSCRIPT OF THE HEARING AT WHICH ABERNATHY WAS ARRAIGNED

Abernathy argues that "reversal is required because [the] appellate record does not contain the pretrial motions hearing at which Mr. Abernathy was arraigned." (Abernathy's brief, p. 88.) Abernathy states that his "appellate counsel requested" a transcript of a November 2016 "hearing at which it appears that the trial court addressed the State's motion to amend indictment and that Mr. Abernathy pleaded not guilty

---

[4]We address Abernathy's issues in a different order than he raises them in his brief.

and not guilty by reason of mental disease or defect as to all charges." (Id. (citation omitted).) Appellate counsel requested the transcript, but the court reporter indicated that her notes and recordings of that hearing had been destroyed. (Id.) Abernathy asserts that "[t]he absence of this transcript violates state and federal law requiring a complete record on appeal." (Id.) He asserts that, "[w]ithout the transcript, there is no way to know what else was discussed [at the hearing] and whether any errors occurred that should be raised on appeal." (Abernathy's brief, p. 89.) He states, "[f]or example, it is unclear if the need for a competency evaluation was discussed as a result of Mr. Abernathy's plea." (Id.)

In Revis v. State, 101 So. 3d 247, 331-32 (Ala. Crim. App. 2011), this Court rejected Revis's contention "that the record [was] inadequate because it [did] not contain a transcription of the arraignment" and some portions of the trial:

> "Although the arraignment was not transcribed, there is no requirement that the arraignment be transcribed. See generally, Fox v. State, 50 So. 3d 494, 496 (Ala. Crim. App. 2007) (on appeal in a capital-murder trial this court noted that, 'nor is there a transcript of arraignment in the record'). Revis makes no allegation of any impropriety during his arraignment, nor does he allege that the arraignment was not held. Furthermore, the record discloses that, in sentencing Revis, the trial court stated that Revis had entered pleas of not guilty to the charges against him."

9

The record before us shows that Abernathy was arraigned and that he had entered pleas of not guilty and not guilty by reason of mental disease or defect. The record also shows that a competency evaluation was done in September 2018 and that the results of that evaluation indicated with "high confidence" that Abernathy was competent to assist in his defense and to stand trial. (C. 120.) Finally, the record shows that the State's motion to amend the indictment was granted only to correct a code citation.

This Court will not "automatically reverse a conviction because the transcript or record is less than complete." Ingram v. State, 779 So. 2d 1225, 1280 (Ala. Crim. App. 1999). Abernathy has shown no prejudice or reversible error on this issue, and he is due no relief.

## II. TRIAL COURT'S FAILURE TO SUA SPONTE REMOVE JUROR S.Re. FOR CAUSE

Before trial, Abernathy moved the trial court to require prospective jurors to complete a questionnaire. The State noted its agreement with the motion, and the trial court granted the motion. On the first day of trial, the trial court divided prospective jurors into two panels—a morning panel and an afternoon panel. After the morning panel of

prospective jurors was sworn, general qualification began, and those prospective jurors not dismissed were given questionnaires to complete. When most veniremembers were finished filling out their questionnaires, the trial court told the members of the morning panel that the attorneys would review the completed questionnaires and that, once they had completed their questionnaires, they were free to go for the day and to return at 8:45 the next morning. The trial court used the same procedure with the afternoon panel.

The next day, the parties agreed to proceed with voir dire of the morning panel first and then to question individuals. The State questioned the panel, and then defense counsel questioned several veniremembers about their questionnaire responses. After a break, the trial court gave the parties the chance to bring back prospective jurors for individual questioning. Defense counsel requested eight from the morning panel.

The trial court and parties followed a similar procedure with the afternoon panel. The parties agreed to strike several members for cause, and the trial court heard Abernathy's motions to strike other members for cause. S.Re. was not mentioned.

In response to question no. 62 on the juror questionnaire—"Is there anything about the nature of the charges or the facts of the case (as they have been explained to you thus far) that causes you to doubt your ability to be fair and impartial?"—S.Re. (no. 388), a retired elementary teacher who served on Abernathy's jury, checked "Yes" and wrote, "I am friends with the niece of one of the victims." In response to question no. 63—"Do you know of any reason whatsoever why you could not, or should not, serve as a juror in this case?"—S.Re. did not check "Yes" or "No." But in response to "If yes, please explain," S.Re. wrote, "The above." Abernathy asserts that these responses "indisputably establish[] that Juror S.Re. [was] biased and that she could not be a fair and impartial juror in this case." (Abernathy's brief, p. 15.)

Abernathy also asserts that S.Re. "expressed additional areas of bias." (Abernathy's brief, p. 17.) He notes that she checked "Disagree" after the statement:

> "The Defendant in this case, Donnie Abernathy, is presumed innocent and cannot be found guilty of any offense unless the jury, unanimously and based solely on the evidence presented in court, decides that the State has proven each element of the offense beyond a reasonable doubt. The burden of proving guilt beyond a reasonable doubt rests entirely with the State. Donnie Abernathy is not required to prove his innocence."

S.Re. did not respond to the prompt, "Please explain."

Abernathy asserts that "S.Re. also responded that she disagreed with law establishing that a defendant's silence could not be used against him" and agreed "'that if someone does not testify then he or she must be hiding something.'" (Abernathy's brief, p. 18.) Finally, he cites S.Re.'s indication that she would give more weight to testimony from a member of law enforcement "as opposed to any other witness." (Id.) S.Re. explained on her questionnaire that "[t]hey would be more experienced." She offered no written explanation for her other responses cited by Abernathy.[5]

Although Abernathy raised no issue over any of these responses in

---

[5]S.Re. also answered in her questionnaire that her friends would describe her as "very loyal, fair, honest"; that her views on the death penalty "would depend on the case. Only rare instances"; that her views on the death penalty were due to her "religious beliefs"; that her religious views teach that "[a] person has a chance to be forgiven under certain circumstances"; that in her opinion the death penalty is not the only appropriate sentence for someone who is guilty of capital murder; that in her opinion "even the worst criminal [could] turn his life around"; that she had heard no news or discussions of the case; that she had not formed an opinion in the case; that she had no personal reason for wanting to serve as a juror; and that there was nothing she wanted to discuss privately with the judge. S.Re. also indicated on her questionnaire that she knew potential witnesses Josh Summerford, Shawn Rogers, Brent Snead, Jeff Shaver, and Jeremy Deaton, as well as the prosecutors, Michael O'Dell and Robert Johnston, and the trial judge.

the trial court, he argues that the trial court's failure to sua sponte remove S.Re. was plain error. Cf. Lindsay v. State, 326 So. 3d 1, 22 (Ala. Crim. App. 2019) ("Lindsay did not move to remove prospective juror M.O. for cause; therefore, we review this claim for plain error. See Rule 45A, Ala. R. App. P."). In support of his claim, Abernathy relies principally on Ex parte Killingsworth, 82 So. 3d 761 (Ala. 2010).

In Killingsworth, F.J. during voir dire stated that she knew members of the families of the victims. When asked directly if she "[c]ould … put all of that out of your mind and just sit on this jury and listen to the evidence," F.J. replied, "No, sir." She also nodded affirmatively when asked if she thought she "would be biased by that." The Alabama Supreme Court noted that, although "[t]he other 13 potential jurors who were dismissed all indicated an inability to be fair and impartial," the trial court did not dismiss F.J., and F.J. served on the jury. The Supreme Court found that the failure to dismiss F.J. was plain error:

> "F.J. testified that she knew members of the victims' family. The fact that a prospective juror knows the victim or members of the victim's family does not automatically disqualify the prospective juror for cause. Harris v. State, 632 So. 2d 503, 521 (Ala. Crim. App. 1992), aff'd, 632 So. 2d 543 (Ala. 1993), aff'd, 513 U.S. 504, 115 S. Ct. 1031, 130 L. Ed. 2d 1004 (1995). Unless the prospective juror indicates on voir dire that his or her relationship with the victim or the victim's family would

14

prevent him or her from being fair and impartial, a challenge for cause should be denied. <u>Dunning v. State</u>, 659 So. 2d 995, 997 (Ala. Crim. App. 1994). Here, F.J. stated unequivocally that she could not be impartial. Nothing in the record indicates that F.J. was asked any additional questions regarding her partiality toward the victims' family members, which is in contrast to other jurors, whose answers regarding their partiality were equivocal. Instead, it appears that both the trial court and the parties may have been confused when the court dismissed C.J., with whom F.J. shared a last name and who never indicated that she could not be impartial, only that she did not want to serve. Nevertheless, F.J., a juror who unequivocally stated that she could not be impartial, sat on the jury that ultimately convicted Killingsworth.

"....

".... Killingsworth's right to an impartial jury was violated, and he is entitled to a new trial."

82 So. 3d at 764-65. <u>Killingsworth</u> is distinguishable.

First, S.Re. never stated unequivocally that she could not be fair and impartial. See <u>Killingsworth</u>, 82 So. 3d at 764 ("The fact that a prospective juror knows the victim or members of the victim's family does not automatically disqualify the prospective juror for cause."); <u>see also</u> <u>Petersen v. State</u>, 326 So. 3d 535, 557 (Ala. Crim. App. 2019) ("[T]he failure of a court to sua sponte remove a juror from the venire does not rise to the level of plain error where there is no indication in the record that the juror could not be fair and impartial."). The responses of S.Re. to

15

questions no. 62 and no. 63 were not unequivocal and unambiguous like the responses of F.J. in <u>Killingsworth</u>. The fact that a prospective juror indicates doubt in a juror questionnaire about whether he or she can remain impartial based on a familiarity with a relative of a victim is not tantamount to absolute bias.

Second, unlike the trial court in <u>Killingsworth</u>, which heard the responses during voir dire, nothing in the record shows that the trial court knew about S.Re.'s responses. Abernathy cites no decision in which this Court or the Alabama Supreme Court has found plain error based on a trial court's failure to sua sponte remove a prospective juror based solely on responses to a questionnaire—and even more so questionnaire responses that the record does not show that the trial court knew about. Trial courts are not omniscient, and we know of no authority requiring trial courts to parse juror questionnaires to follow up on any indication, however slight, of possible bias.

The trial court's failure to sua sponte remove S.Re. was not plain error, and Abernathy is due no relief on this issue.

### III. DENIAL OF ABERNATHY'S MOTIONS TO REMOVE FOUR JURORS

Abernathy argues that the trial court erred in denying his motions

to remove prospective jurors E.M. (no. 365), M.B. (no. 236), C.Cr. (no. 266), and J.R. (no. 390). E.M. served on Abernathy's jury, and M.B. was an alternate. Abernathy used peremptory strikes to remove C.Cr. and J.R.[6]

> " 'To justify a challenge for cause, there must be a proper statutory ground or "'some matter which imports absolute bias or favor, and leaves nothing to the discretion of the trial court.'" Clark v. State, 621 So. 2d 309, 321 (Ala. Cr. App. 1992) (quoting Nettles v. State, 435 So. 2d 146, 149 (Ala. Cr. App. 1983)). This Court has held that "once a juror indicates initially that he or she is biased or prejudiced or has deep-seated impressions" about a case, the juror should be removed for cause. Knop v. McCain, 561 So. 2d 229, 234 (Ala. 1989). The test to be applied in determining whether a juror

_____

[6]Although we hold that the trial court did not abuse its discretion in denying Abernathy's motions to remove E.M., M.B., C.Cr., and J.R., we also note that, because M.B. was an alternate and was removed before jury deliberations and because Abernathy used peremptory strikes to remove C.Cr. and J.R.,

"any error in failing to remove these jurors for cause was harmless beyond a reasonable doubt. '[T]he Alabama Supreme Court has held that the failure to remove a juror for cause is harmless when that juror is removed by the use of a peremptory strike. Bethea v. Springhill Mem'l Hosp., 833 So. 2d 1 (Ala. 2002).' Pace v. State, 904 So. 2d 331, 341 (Ala. Crim. App. 2003). Cf. Ex parte Colby, 41 So. 3d 1 (Ala. 2009) (may not be harmless when multiple challenges for cause are involved)."

Thompson v. State, 153 So. 3d 84, 115 (Ala. Crim. App. 2012).

should be removed for cause is whether the juror can eliminate the influence of his previous feelings and render a verdict according to the evidence and the law. Ex parte Taylor, 666 So. 2d 73, 82 (Ala. 1995). A juror "need not be excused merely because [the juror] knows something of the case to be tried or because [the juror] has formed some opinions regarding it." Kinder v. State, 515 So. 2d 55, 61 (Ala. Cr. App. 1986). Even in cases where a potential juror has expressed some preconceived opinion as to the guilt of the accused, the juror is sufficiently impartial if he or she can set aside that opinion and render a verdict based upon the evidence in the case. Kinder, [515 So. 2d] at 60-61. In order to justify disqualification, a juror "'must have more than a bias, or fixed opinion, as to the guilt or innocence of the accused'"; "'[s]uch opinion must be so fixed ... that it would bias the verdict a juror would be required to render.'" Oryang v. State, 642 So. 2d 979, 987 (Ala. Cr. App. 1993) (quoting Siebert v. State, 562 So. 2d 586, 595 (Ala. Cr. App. 1989)).'

"Ex parte Davis, 718 So. 2d 1166, 1171-72 (Ala. 1998). Further,

"'"[t]he qualification of prospective jurors rests within the sound discretion of the trial judge." Morrison v. State, 601 So. 2d 165, 168 (Ala. Crim. App. 1992); Ex parte Cochran, 500 So. 2d 1179, 1183 (Ala. 1985). This Court will not disturb the trial court's decision "unless there is a clear showing of an abuse of discretion." Ex parte Rutledge, 523 So. 2d 1118, 1120 (Ala. 1988). "This court must look to the questions propounded to, and the answers given by, the prospective juror to see if this discretion was properly exercised." Knop [v. McCain], 561 So. 2d [229] at 232 [(Ala. 1989)].

18

We must consider the entire voir dire examination of the juror "in full context and as a whole." Ex parte Beam, 512 So. 2d 723, 724 (Ala. 1987); Ex parte Rutledge, 523 So. 2d at 1120.'

"Ex parte Burgess, 827 So. 2d 193, 198 (Ala. 2000)."

Mulkey v. State, [Ms. CR-2023-0304, May 2, 2025] ___ So. 3d ___, ___ (Ala. Crim. App. 2025).

## JUROR E.M.

On her questionnaire, E.M. responded that she would give "more weight" to testimony from law-enforcement officers, explaining that "law enforcement is held in a higher regard." She was then summoned for individual questioning by the parties and the trial court. In the first questioning, this exchange with defense counsel occurred:

"[DEFENSE COUNSEL]: So is that to say that if you have investigators or officers testifying, that that would carry—you would consider that more truthful than maybe another witness testifying, like an eyewitness or—

"[E.M.]: Not necessarily.

"[DEFENSE COUNSEL]: Okay. Can you explain what you mean by that?

"[E.M.]: I don't feel like it would [sic] one versus the other in that sense. I think anybody is capable of getting up there and telling the truth or not telling the truth. I think a law enforcement officer would be more likely to always tell the truth. That's the hope. But it was more so that I think an

19

average person is capable of either.

"[DEFENSE COUNSEL]: Sure. But—but you're saying that you would—you would consider law enforcement to be more truthful testimony?

"[E.M.]: Ideally.

"[DEFENSE COUNSEL]: Okay. Okay. That's all I have. I don't have anything else."

(2d Supp. R. 689-90.) Abernathy moved to strike E.M. for cause, stating,

"I just think that the questionnaire is the unbridled answer." (2d Supp.

R. 709.) The State objected to the motion, arguing that "I don't think that

what she commented on rose to the level of being disqualified. She said

she was hopeful law enforcement would be truthful. Didn't say she would

automatically believe one over another." (2d Supp. R. 709.)

The trial court summoned E.M. for more questioning:

"THE COURT: … [I]n your answer, I believe number 41, that you would give more weight to the testimony of a law enforcement officer as opposed to any other witness, we want to follow up with you ….

"[PROSECUTOR]: Ms. [M.], I didn't ask you questions earlier because I understood you in the end to say that that was aspirational, that your hope would be—

"[E.M.]: Right.

"[PROSECUTOR]: —that every law enforcement officer would be truthful when they took the stand because that's

part of their job?

"[E.M.]: Right.

"[PROSECUTOR]: Is that what you meant?

"[E.M.]: Yes.

"[PROSECUTOR]: All right. In other words, every single law enforcement officer wouldn't automatically be believed over any other witness?

"[E.M.]: No. And there's somewhere in there that I did put, you know, not—and I can't remember the question, but that I do understand that not every law enforcement officer is of a good intent. There are bad ones, but I do think that the good ones outweigh the bad ones. But that there are what you would consider bad ones and—if that's an answer.

"[PROSECUTOR]: Right. Right. …

"Can you weigh each person's testimony, their various motives, their demeanor, what they're saying, and give it the weight that it is due without respect to whether or not they're law enforcement or a civilian?

"[E.M.]: Yes. And I think what you said is true. It's more—you would like to think that law enforcement is held in a higher regard and would always be truthful. Do I think they are? Maybe not. I don't know. It would depend on what you gather from—from while they're up there giving their testimony.

"[PROSECUTOR]: And so each time that you answered that question, I understood you to say hopefully, not unequivocally yes?

"[E.M.]: Right.

21

"....

"[DEFENSE COUNSEL]: And I'll just rephrase, maybe the question. I guess more specifically the question is: Do you believe that, by nature, the fact they're wearing a uniform will make them more truthful?

"[E.M.]: Than any other witness? Not necessarily. I mean, you might have a preacher up there, and you would say, well, a preacher would never lie. No, that's not true either.

"[DEFENSE COUNSEL]: Okay."

(2d Supp. R. 714-17.) The trial court then denied Abernathy's motion to strike E.M. for cause.

Abernathy has not shown that the trial court abused its discretion in denying his motion to strike E.M. As the above exchanges show, her "answers did not indicate an absolute bias or favor toward law-enforcement officers." Francis v. State, 368 So. 3d 919, 930 (Ala. Crim. App. 2020).

## ALTERNATE JUROR M.B.

On her questionnaire, in response to the statement that "[a] criminal defendant should be required to produce evidence to prove that he or she is not guilty," M.B. indicated her agreement with that statement with a "9"—with "10" indicating the strongest agreement.

Defense counsel questioned her about it:

"[DEFENSE COUNSEL]: ... Can you tell me why you put that answer?

"[M.B.]: I really think that, you know, there are two sides to every story, but the—apparently the burden of proof is on the State to prove that someone is guilty.

"[DEFENSE COUNSEL]: Okay. Does—does that go along with your answer on the question about a person not testifying?

"[M.B.]: Now, I do wish that everyone was, you know, forced to testify because you don't really get a feel for, you know, who they are as a person without hearing things in their own words.

"[DEFENSE COUNSEL]: All right. And the law says—

"[M.B.]: Doesn't make them.

"[DEFENSE COUNSEL]: It doesn't make them. And that you can't make an assumption that the reason they didn't testify is they're guilty.

"[M.B.]: Right.

"[DEFENSE COUNSEL]: All right. Now, that's what the law says.

"[M.B.]: True to yourself.

"[DEFENSE COUNSEL]: Human nature says the more information, the more I know. And so you're going to be looking, are you not, for—for something to come from this side of the room as opposed to all—all the evidence coming from the State, is that fair to say?

"[M.B.]: Yes."

(2d Supp. R. 614-15.)

The trial court summoned M.B. for follow-up questioning:

"[DEFENSE COUNSEL]: Ma'am, we talked out there for a little while and got the impression that you believe that—that a defendant … ought to testify in his or her own trial and that you would be looking for them to come forward with testimony themselves?

"[M.B.]: I would like to hear it. But, I mean, if it's—I do understand the whole perjuring yourself or, you know, not being able to articulate your side, so I do understand that.

"[DEFENSE COUNSEL]: Okay. And when you would say that they were committing perjury, it'd be that they weren't telling the truth, right, if they said, I'm innocent, I was somewhere else, et cetera?

"[M.B.]: Correct.

"[DEFENSE COUNSEL]: All right. So that would—is it fair to say that maybe the flip side of that statement is that if they're not testifying, there's something to hide?

"[M.B.] I don't necessarily believe that. I mean maybe you are just too nervous and cannot speak or you're afraid that you would stumble over something and—if someone asks you a question that you don't know how to answer correctly.

"[DEFENSE COUNSEL]: Okay.

"[M.B.]: I kind of like to hear both sides of every story.

"[DEFENSE COUNSEL]: Sure.

24

"[M.B.]: I'm just one of those on-the-fence people. And, you know, until I hear everyone's side, I hate to pick one until I've heard everything. So I like to give people a chance to speak for themselves, but—

"[DEFENSE COUNSEL]: So as a follow-up to that … you had mentioned that you understood what the law is, but that you wish we were in a position where we could force the defendant to testify. You said, I wish we could just force people to testify.

"[M.B.]: Well, if you could just hear everything in someone's own words it's going to be different than if you heard it secondhand.

"[DEFENSE COUNSEL]: Sure. So my question to you is: … [I]f a defendant chooses not to testify, whether that's by the attorney or themselves, and you're not provided the reason for it, would that be something that you would consider when you're deliberating to determine guilt is, you know, what, he's—it still bothers me that he didn't testify?

"[M.B.]: No. I think—you know, I think I could probably still say they don't necessarily have anything to hide, maybe they just had other reasons for not doing it.

"[DEFENSE COUNSEL]: Okay. If there is no evidence presented by the defense, if it's only evidence by—by the State, would you still be able to hold them to their burden or would you weigh that more heavily in their favor, just the fact that you did not hear any evidence from the defense?

"[M.B.]: I mean, I think—wow. With—with only one side of the story? Yes, I would probably tend to—to lean toward where all the evidence lay. I mean—

"[DEFENSE COUNSEL]: Okay.

25

"[M.B.]: —you know, if there were not background reasons—for committing an act or anything like that.

"[DEFENSE COUNSEL]: Okay. Thank you.

"[PROSECUTOR]: That question seems to presuppose that they would sit there quietly while we presented a case for three days. You know, … they will be cross-examining and—and trying to hold our evidence up to scrutiny. I think a better question might be:  Would you hold his not testifying against him? And could you—

"[M.B.]: I could be impartial.

"[PROSECUTOR]: Yeah. In other words, if we presented evidence, even if they didn't present evidence, would you still hold us to the standard that you would not convict until—unless and until we had presented evidence to convince you beyond a reasonable doubt?

"[M.B.]: I mean, again, I'm kind of one of those on-the-fence people. I can't decide what I want to eat for dinner, you know, one of those. But, no, I would definitely want to hear, you know both sides. But if there was overwhelming evidence, you know—

"[PROSECUTOR]: And their side might—

"[M.B.]: —on one rather than the other and no background story or anything like that, then, you know, I would probably tend to—

"[PROSECUTOR]: What I hear [defense counsel] saying is that their side may—I don't know. They don't have to tell us, and that's fine. Their side may be to cross-examine our witnesses and not present any witnesses on—for their defense. And I think the question we just really need

answered is: Would you hold it against him that he didn't testify, if—if he chooses not to?

"[M.B.]: No.

"[PROSECUTOR]: Okay. Okay. I think that's all I have.

"[DEFENSE COUNSEL]: Nothing further.

"THE COURT: If … my instructions were that Mr. Abernathy is presumed innocent, which he is right now, and that that presumption of innocence is only overcome if the State proves him guilty beyond a reasonable doubt, when you went back to the jury room to decide whether to vote guilty or not guilty, would you let the fact that—if Mr. Abernathy's lawyers decided not to let him testify, would that influence your decision on whether he was guilty or not guilty?

"[M.B.]: No, not really.

"THE COURT: When you say 'not really,' what do you mean?

"[M.B.]: That—that's one of my on-the-fence answers. No. No, I would not hold that against him.

"THE COURT: Would you be able to follow my instructions that he's presumed innocent?

"[M.B.]: Absolutely.

"THE COURT: Would you be able to follow my instructions that that presumption is only overcome by the State if they prove the elements of his crime beyond a reasonable doubt?

"[M.B.]: Yes.

"THE COURT: Would you be able to follow my instructions that you are not allowed to consider the fact that he did not testify?

"[M.B.]: Yes. Yes.

"THE COURT: And I give those instructions, and even when you come back here, you would be able to set your personal opinion—or would you—I don't want to ask you a leading question. Would you be able to set your personal feelings aside that go, hey, look, if this was me, I would testify? Would you be able to set that aside and not consider that but follow my instructions?

"[M.B.]: Yes.

"THE COURT: Unequivocally, you would be able to do that?

"[M.B.]: Yes."

(2d Supp. R. 670-77.)

In moving to remove M.B., Abernathy argued that "she kept going back and forth, and she kept describing herself as being on the—on the fence and would—and her responses to you were no, not really." (2d Supp. R. 710.) The trial court denied the motion, finding that its colloquy had sufficiently rehabilitated M.B.

We agree with the trial court. M.B. "was sufficiently rehabilitated through further questioning and responses." Francis, 368 So. 3d at 931. Thus, the trial court did not abuse its discretion in denying Abernathy's

28

motion to remove her for cause. See Albarran v. State, 96 So. 3d 131, 160 (Ala. Crim. App. 2011) ("Prospective juror J.J. clearly stated that she could follow the law as instructed by the court and would not hold Albarran's failure to testify against him. Therefore, the circuit court did not abuse its discretion by denying Albarran's challenge to prospective juror J.J. on the ground that she would like for Albarran to testify.").[7]

PROSPECTIVE JUROR C.Cr.

C.Cr. answered on his questionnaire that the death penalty is the only appropriate punishment for capital murder and said, "If one commits an act of murder … they shouldn't be able to be allowed to have separate treatment." C.Cr. also responded affirmatively during voir dire when defense counsel asked the panel:

> "If you found someone guilty of capital murder—which is intentional murder, murder that occurred with specific intent, intent to kill someone. All right. That's what capital murder is, coupled generally with some other circumstance, like a robbery or a burglary or something like that.

---

[7]Abernathy also cites M.B.'s response on her questionnaire indicating that she would give "more weight" to testimony from law-enforcement officers, explaining in writing, "Given the nature of their job, I would hope that an officer would be more likely to tell the truth." But Abernathy asked no questions about this response, and he did not cite it when he moved to remove her. Thus, we would review any claim based on this response only for plain error. For the reasons stated in Part II of this opinion addressing a similar claim, we find no plain error.

"If you found somebody guilty—this makes sense—you disbelieved any kind of defense, like self-defense, like the death was an accident, or there were mental problems that led to the killing. So you're at the point where you found somebody guilty beyond a reasonable doubt of capital murder. They did it. No defense. Who among y'all would say that the only appropriate sentence at that point is the death penalty—death penalty? Nobody would automatically think that crime requires the death penalty every time?"

(2d Supp. R. 611-12.) The trial court summoned C.Cr. for individual questioning:

"THE COURT: Mr. [Cr.], … if I gave you instructions on the law that … if a jury had found the defendant guilty, that you were to consider certain circumstances that might make you decide in favor of [the] death penalty or certain circumstances that may make you decide in favor of life without parole, would you be able to take those instructions and consider both of those?

"[C.Cr.]: Yes, sir, I would.

"THE COURT: Would you be able to set aside your personal convictions or personal feelings and just follow the law and the instruction as I give it to you?

"[C.Cr.]: Yes, sir.

"THE COURT: And that law and instruction being that there are two possible sentences, one being the death penalty and one being life without parole, and be able to make a decision based on what I tell you?

"[C.Cr.]: Yes, sir. And the evidence too.

30

"THE COURT: Okay. And you don't think that your personal feelings, the fact that people can't—you can't bring people back from the dead, those sorts of things, you would be able to exclude those and not let those creep in on your decision; you would just follow the law based on what I tell you, based on the evidence that you hear?

"[C.Cr.]: Yes, sir."

(2d Supp. R. 638-40.) The trial court denied Abernathy's motion to remove C.Cr.

C.Cr. "was sufficiently rehabilitated through further questioning and responses." Francis, 368 So. 3d at 931. Thus, the trial court did not abuse its discretion in denying Abernathy's motion to remove him for cause. See Albarran, 96 So. 3d at 160.

PROSPECTIVE JUROR J.R.

In her questionnaire, J.R. indicated that she thought death was the only appropriate sentence for capital murder, emphasizing that "[t]he Bible states 'Thou shalt not kill.' I believe, if you are found guilty … then your life should be taken" and that "why should a person get to 'carry on' with their life, when an 'innocent victim' is dead." During voir dire, J.R. explained that her father was a minister. Defense counsel asked her if she thought that, for capital murder, "the death penalty is the only appropriate sentence according to your personal moral code." (2d Supp.

31

R. 495-96.) J.R. replied, "Yes and no," explaining that "[t]he yes would be because I don't want to dishonor my father because of how much he meant to me" and "the no because it's not the law." (2d Supp. R. 496.) J.R. agreed that life without the possibility of parole was a viable choice and that "[i]f the situation warrants it," she "would be okay with saying, in this case I recommend life without parole." (2d Supp. R. 497.)

The trial court brought J.R. back for further questioning. Replying to questions from defense counsel, J.R. assured counsel and the trial court "that whatever the instructions of the court were, that's what [she] would follow" about "considering life without parole and the death penalty." (2d Supp. R. 545-46.)

> In denying Abernathy's motion to remove J.R., the trial court found:

> "I think … once we followed up with her—I think she even said that, quote, she had to be—she had to honor God and herself. … [S]he distanced herself from the emotion and said that she could do … what I instructed, even above her emotion for her father. So I'll leave [her] on there, and that will be over the objection of the defendant."

(2d Supp. R. 571.)

We agree with the trial court's finding. J.R. "was sufficiently rehabilitated through further questioning and responses." Francis, 368 So. 3d at 931. Thus, the trial court did not abuse its discretion in denying

32

Abernathy's motion to remove her for cause. See Albarran, 96 So. 3d at 160.

In part VII.B of his brief, Abernathy argues that eight jurors on his jury were biased and would have been the subject of peremptory challenges. (Abernathy's brief, p. 65.) This part of Abernathy's argument hinges on his claims, which we have rejected, that the trial court abused its discretion in denying his motions to remove prospective jurors E.M., M.B., C.Cr., and J.R. What's more, Abernathy's allegations of bias hinge solely on the jurors' responses to questionnaires. But Abernathy asked no questions about those responses. Thus, we would review this claim only for plain error. For the reasons stated in Part II of this opinion addressing a similar claim, we find no plain error.

## IV.   ADMISSION OF AUTOPSY AND CRIME-SCENE PHOTOGRAPHS

Abernathy argues that "the trial court erred in admitting into evidence 27 disturbing autopsy and crime scene photographs depicting the bodies of Sylvia Duffe, Clara Edwards, and Pam Oshel … when there was no dispute as to their cause of death." (Abernathy's brief, pp. 89-90.) Abernathy argues that any probative value of the photographs "was far outweighed by the photographs' prejudicial effect." (Abernathy's brief, p.

90.)

This claim is subject to plain-error review. Abernathy did not object to the photographs in the trial court, and his cursory argument on appeal is little more than bald assertion. <u>Cf.</u> Rule 28(a)(10), Ala. R. App. P.; <u>Ex parte Borden</u>, 60 So. 3d 940, 944 (Ala. 2007).

This Court has long held that autopsy photographs and the like are admissible even if they are gruesome. <u>See, e.g.</u>, <u>Stanley v. State</u>, 335 So. 3d 1, 54 (Ala. Crim. App. 2020) ("'"The fact that a photograph is gruesome and ghastly is no reason to exclude it from the evidence, so long as the photograph has some relevancy to the proceedings, even if the photograph may tend to inflame the jury."' <u>Eggers v. State</u>, 914 So. 2d 883, 914-15 (Ala. Crim. App. 2004) (quoting <u>Bankhead v. State</u>, 585 So. 2d 97, 109-10 (Ala. Crim. App. 1989), remanded on other grounds, 585 So. 2d 112 (Ala. 1991), aff'd on return to remand, 625 So. 2d 1141 (Ala. Crim. App. 1992), rev'd, 625 So. 2d 1146 (Ala. 1993))."). <u>See also</u> <u>Burton v. State</u>, 521 So. 2d 91, 92 (Ala. Crim. App. 1987) ("Photographs which show external wounds in the body of a deceased victim, even though they are cumulative and based upon undisputed matters, are admissible. The fact that they are gruesome is not grounds to exclude them so long as

34

they shed light on the issues being tried. <u>Warrick v. State</u>, 460 So. 2d 320 (Ala. Cr. App. 1984). Having such items admitted into evidence 'comes with the territory' in cases dealing with violence against the person. Further, the receipt into evidence of such exhibits lies within the sound discretion of the trial court. <u>Hopkins v. State</u>, 429 So. 2d 1146 (Ala. Cr. App. 1983)."). Abernathy has shown no error, plain or otherwise, in the admission of the photographs.

## V. ADMISSION OF IMAGES OF TEXT MESSAGES BETWEEN ABERNATHY AND HAMILTON

Abernathy argues that the trial court admitted into evidence, over his objection, "photographs of a phone displaying alleged text messages between Mr. Abernathy and Jerrica Hamilton." (Abernathy's brief, p. 47.) Abernathy argues that "[t]he contents of the photographs, however, were not properly authenticated and contained inadmissible hearsay." (<u>Id.</u>)

In Hamilton's deposition, she testified that her cell phone was inside the vehicle when Abernathy was trying to evade the police. Hamilton testified that Abernathy handed her phone to her "in the car," telling her "to call 911 back" and say that the first call to 911 call was a misunderstanding and "that … a roommate … had scared" Hamilton. (C. 4338, 4357.)

At trial, Leigha Blake, who in 2015 worked as an investigator for the City of Centre, testified that she had recovered a cell phone from Abernathy's vehicle after the crash. (R. 172-73, 190-91.) Inv. Blake testified that she had read the text messages on that device and had captured images of those text messages. (R. 173-74.) The State introduced State's Exhibits 13-34 and presented them to Inv. Blake, who stated that they accurately reflected what she had captured on the phone. (R. 174.) She described the images, beginning with an image showing a message thread on the phone with a contact named "Donnie." Each text message from "Donnie" in the thread includes a message signature, "Mackenzie's Daddy."[8] (R. 180-81.)

In her deposition, Hamilton testified that, based on text messages she had received from Abernathy in the days leading up to and on the day of the murders, she was under the impression that Abernathy was angry and jealous. (C. 4327-28, 4344.) She stated that Abernathy was asking in the messages who she was with and that he suspected she was seeing someone. (C. 4328.) Defense counsel also questioned Hamilton

---

[8]Evidence showed that Abernathy and Hamilton had a child named Mackenzie.

36

about the text messages. (C. 4344-45.) Hamilton said that she did not recall "the exact words" in the messages but that Abernathy "was very upset" and that "it felt like he was being very jealous of what was going on at that time." (C. 4344.) Hamilton told defense counsel that she had not seen Abernathy watch her, but that "it felt like somebody was watching." (C. 4345.)

When the State sought to admit State's Exhibits 13-34 through Inv. Blake's testimony, Abernathy objected. He argued first that Hamilton's testimony was necessary to authenticate the phone. He asserted that "we had an opportunity to present [Hamilton] with phone screen captures and text messages, and that was not done." (R. 175.) Abernathy also asserted that the statements in the messages were "hearsay."

The prosecutor responded that Hamilton was blind and thus could not be shown images. He also argued that the communication shown in the photos corroborated Hamilton's testimony "that she received a barrage of text messages" from Abernathy, "so many that she quit responding to them." (R. 175.) The prosecutor also argued that statements from Abernathy were not hearsay and that the other messages in the thread attributable to Hamilton were admissible at a

minimum to provide context. The trial court admitted the exhibits.

On appeal, Abernathy argues that the text messages between Abernathy and Hamilton were not properly authenticated. He argues that "[i]nstead of seeking to authenticate the text messages through the extraction report, through a telephone service provider, or through Ms. Hamilton herself, the State sought to authenticate text messages contained in photographs through" Inv. Blake's testimony, "an investigator who simply took the photographs, but was in no position to authenticate the cell phone or the messages themselves." (Abernathy's brief, pp. 48-49.) Abernathy argues that "the State did not meet even the minimum requirements for authenticating these text messages by confirming who the phone numbers at issue belonged to, or even establishing what the two phone numbers were." (Id. at 49-50.)

> "'""The admission or exclusion of evidence is a matter within the sound discretion of the trial court.' Taylor v. State, 808 So. 2d 1148, 1191 (Ala. Crim. App. 2000), aff'd, 808 So. 2d 1215 (Ala. 2001). 'The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court's determination on that question will not be reversed except upon a clear showing of abuse of discretion.' Ex parte Loggins, 771 So. 2d 1093, 1103 (Ala. 2000). In addition, '[t]rial courts are vested with considerable discretion in determining whether evidence is relevant, and such a determination will not be reversed absent plain error or an abuse of discretion.' Hayes v. State, 717 So. 2d 30, 36 (Ala. Crim. App. 1997)."'"

Capote v. State, 323 So. 3d 104, 121 (Ala. Crim. App. 2020) (quoting

Woods v. State, 13 So. 3d 1, 23 (Ala. Crim. App. 2007), quoting in turn

Gavin v. State, 891 So. 2d 907, 963 (Ala. Crim. App. 2003)).

Rule 901(a), Ala. R. Evid., provides: "The requirement of

authentication or identification as a condition precedent to admissibility

is satisfied by evidence sufficient to support a finding that the matter in

question is what its proponent claims."

> "Rule 901(b), Ala. R. Evid., provides a nonexhaustive list of ways to properly authenticate evidence. For example, pursuant to Rule 901(b)(1), evidence may be authenticated by testimony from a witness with knowledge 'that a matter is what it is claimed to be.' Additionally, however, pursuant to Rule 901(b)(4), evidence may be authenticated by '[d]istinctive [c]haracteristics and the [l]ike,' such as '[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances.'"

Thomas v. State, 302 So. 3d 720, 727 (Ala. Crim. App. 2019).

In Culp v. State, 178 So. 3d 378 (Ala. Crim. App. 2014), this Court

addressed the proper authentication of emails. Discussing cases from

other jurisdictions, this Court quoted with approval State v. Koch, 157

Idaho 89, 334 P.3d 280 (2014):

> "'Because Idaho Rule of Evidence 901 is based on Federal Rule of Evidence 901, how other jurisdictions have interpreted the federal rule's requirements with regard to the

admission of e-mails and text messages is instructive in this case. Other jurisdictions have recognized that electronic evidence may be authenticated in a number of different ways consistent with Federal Rule 901 and corresponding state statutes. Courts have not required proponents offering printouts of e-mails, internet chat room dialogues, and cellular phone text messages to authenticate them with direct evidence, such as an admission by the author or the testimony of a witness who saw the purported author typing the message. See, e.g., United States v. Fluker, 698 F.3d 988, 999 (7th Cir. 2012). Rather, courts have held that circumstantial evidence establishing that the evidence was what the proponent claimed it to be was sufficient. See, e.g., State v. Thompson, 777 N.W.2d 617, 624 (N.D. 2010) (providing a comprehensive review of other jurisdictions' authenticity requirements for electronic communications). Circumstantial proof might include the e-mail address, cell phone number, or screen name connected with the message; the content of the messages, facts included within the text, or style of writing; and metadata such as the document's size, last modification date, or the computer IP address. See Fluker, 698 F.3d at 999; United States v. Siddiqui, 235 F.3d 1318, 1322-1323 (11th Cir. 2000); United States v. Safavian, 435 F. Supp. 2d 36, 40-41 (D.D.C. 2006).'"

Culp, 178 So. 3d at 384 (quoting Koch, 157 Idaho at 96, 334 P.3d at 287).

This Court in Culp held that emails were properly authenticated under Rule 901(b)(4) based on evidence showing "distinctive characteristics and the like." See also Smith v. State, 196 So. 3d 1191, 1202 (Ala. Civ. App. 2015) ("This court has reviewed the packet of e-mails and text messages (some of which are duplicates), and the tone, syntax, appearance, and other characteristics over months' worth of conversations remain

40

consistent. Based on the totality of the e-mails and the text messages and the circumstances under which they were sent, i.e., casual conversations between friends, we are of the opinion that sufficient circumstantial evidence exists to support the trial court's determination that the e-mails and text messages were admissible.").

The hurdle for authenticating text messages is not high. As one Court has observed:

"It is widely recognized that a prima facie showing of authenticity is a low burden. See United States v. Barnes, 803 F.3d 209, 217 (5th Cir. 2015) (standard 'is not a burdensome one' (internal quotation marks omitted)), cert. denied sub nom. Hall v. United States, 580 U.S. 1078, 137 S. Ct. 691, 196 L. Ed. 2d 570 (2017); United States v. Tin Yat Chin, 371 F.3d 31, 38 (2d Cir. 2004) ('minimal standards for authentication'); Lorraine v. Markel American Ins. Co., … 241 F.R.D. [534,] 545 [(D. Md. 2007)] (recognizing 'the proponent's light burden of proof in authenticating an exhibit' (internal quotation marks omitted)); Gagliardi v. Commissioner of Children & Families, 155 Conn. App. 610, 619, 110 A.3d 512 (bar for authentication of evidence is not particularly high), cert. denied, 316 Conn. 917, 113 A.3d 70 (2015); State v. Mrza, 302 Neb. 931, 938, 926 N.W.2d 79 (2019) ('[the] rule does not impose a high hurdle for authentication'). This is because '[a] proponent of evidence is not required to conclusively prove the genuineness of the evidence or to rule out all possibilities inconsistent with authenticity.' (Emphasis added.) State v. Mrza, supra, at 938, 926 N.W.2d 79; accord Campbell v. State, 382 S.W.3d 545, 549 (Tex. App. 2012); see also State v. Valentine, 255 Conn. 61, 77, 762 A.2d 1278 (2000) ('[t]he proffering party must demonstrate to the trial court that there is substantial evidence from which the jury could infer that the telephone

41

communication was authentic' (emphasis added)).

"The commentary to our rule of evidence makes clear that electronic communications, such as text messages, are subject to the same standard of authentication and the same methods of authentication as other forms of evidence: 'As with any other form of evidence, a party may use any appropriate method, or combination of methods, described in this commentary, or any other proof to demonstrate that the proffer is what its proponent claims it to be, to authenticate any particular item of electronically stored information.' Conn. Code Evid. (2018) § 9-1, commentary; cf. State v. Hannah, 448 N.J. Super. 78, 88-89, 151 A.3d 99 (App. Div. 2016) ('Despite the seeming novelty of social [network generated] documents, courts have applied the existing concepts of authentication .... We need not create a new test for social media postings.' (Citations omitted; internal quotation marks omitted.))."

State v. Manuel T., 337 Conn. 429, 454-55, 254 A.3d 278, 294-95 (2020).

The State's evidence showed that Hamilton and Abernathy had exchanged text messages the day of the murders, including the content and context of those messages; that Inv. Blake recovered the phone from Abernathy's car, read the messages, and made images of the messages; and that the messages were from Abernathy, as shown by the contact name "Donnie," the signature "Mackenzie's Daddy," and the context of the messages. This Court has reviewed the messages, and the content, tone, appearance, and other characteristics are consistent with Hamilton's testimony about the messages Abernathy had sent her.

The trial court did not abuse its considerable discretion in finding that the State had provided a sufficient foundation under Rule 901, Ala. R. Evid., to show that the phone recovered from Abernathy's car was Hamilton's and that the messages in the screenshots were from Abernathy to Hamilton. Authorship of the messages was a question for the jury to decide. See, e.g., Capote, 323 So. 3d at 123 ("The State presented sufficient evidence tending to connect the letters to Capote. Actual authorship of the letters was for the jury to decide."). Abernathy is due no relief on his argument that the State did not properly authenticate the phone or the messages.

As for Abernathy's assertions that the messages included inadmissible hearsay statements from Hamilton to Abernathy, he argues that the State used statements from Hamilton to show that Abernathy was "spying" on Hamilton and that Abernathy had acted out of jealousy. The crux of those statements, however, was cumulative to Hamilton's testimony in her deposition that she thought Abernathy seemed jealous and that she felt like she was being watched by somebody. Thus, we need not decide whether the messages included inadmissible hearsay from Hamilton, because, even if they did, any error in their admission was

43

harmless. See Ward v. State, 589 So. 2d 777, 779 (Ala. Crim. App. 1991) ("Harmless error occurs when the hearsay evidence erroneously admitted was cumulative of other admissible evidence on the same issue.").

## VI.   ADMISSION OF ABERNATHY'S STATEMENTS

Abernathy argues that the trial court erred in admitting statements Abernathy made to law-enforcement officers. He asserts that the trial court failed to hold a suppression hearing, that his Miranda[9] waiver was invalid, and that his statements were involuntarily made. (Abernathy's brief, pp. 54-55.)

Before trial, Abernathy moved to suppress statements he made after the vehicle crash. The State responded that it did not plan to introduce the statements. At a hearing in September 2021, defense counsel asked for a chance "to get some information about the circumstances of the statement" if the prosecution introduced the statements at trial. (2d Supp. R. 189.) Defense counsel asked the trial court "to have the DA instruct their law enforcement witnesses, if they're about to say something like, Mr. Abernathy told me XYZ, we're going to need notice of that for potential challenge to its submission." (2d. Supp.

---

[9]Miranda v. Arizona, 384 U.S. 436 (1966).

R. 190.) The State agreed, and the trial court granted Abernathy's motion to suppress.

During cross-examination of Inv. Josh Summerford at trial, defense counsel asked whether Inv. Summerford had "participate[d] in any interviews of Ms. Hamilton, Mr. Abernathy, or any other people connected … with this case." (R. 109.) Inv. Summerford replied that he had, and defense counsel then asked if the interviews were recorded:

"[INV. SUMMERFORD]: The … interview that I would have been involved in—there are two interviews I was involved in. One occurred at the emergency room at the hospital. That would not have been recorded. And there was a subsequent interview of the suspect at the sheriff's office in the interview room that … should have been recorded.

"[DEFENSE COUNSEL]: Okay. Do you know if it, in fact, was?

"[INV. SUMMERFORD]: … I never viewed it. … I was chief investigator at that time. There was an issue with the recording system, and we replaced that recording system … very soon after that because there was a problem with the recording system.

"[DEFENSE COUNSEL]: At—at the hospital, was anybody wearing a body camera?

"[INV. SUMMERFORD]: No.

"[DEFENSE COUNSEL]: All right. And with respect to—you—this interview that occurred later at the sheriff's department, you've never seen a video of that?

"[INV. SUMMERFORD]: No, I have not.

"[DEFENSE COUNSEL]: And so it would stand to reason that that either was not interview [sic] or the equipment malfunctioned?

"[INV. SUMMERFORD]: Yes.

"[DEFENSE COUNSEL]: Not—not interviewed. Not recorded. There we go.

"[INV. SUMMERFORD]: That's right. There was an equipment malfunction.

"[DEFENSE COUNSEL]: I see. … Did the audio portion work?

"[INV. SUMMERFORD]: To my knowledge, no. … I was never given … a disk to review … because of the malfunction.

"[DEFENSE COUNSEL]: All right. Very well. Thank you."

(R. 109-11.) The State then requested a sidebar. The trial court dismissed the jury, and the parties took up this matter:

"[PROSECUTOR]: Judge, there was a series of pretrial motions that were dealt with pretrial. One of them asked to suppress statements of the defendant. The statement of the defendant really amounted to little more than I remember driving to that scene and location, I remember parking the car on the side, I don't remember anything after that. So he puts himself on Road 664.

"So because it amounts to nothing more than, hey, I got near the scene but I don't remember anything else, I didn't

think it had a high degree of value. It just didn't seem worth fooling with. And so I consented to the motion just because I didn't want to confuse or mislead the jury when otherwise there was plenty of evidence for the jury to appreciate and comprehend the movements of all the people involved in the case.

"And so now defense counsel asked [Inv.] Summerford if he had any other role in the investigation, for example, interviewing [Jerrica] Hamilton or Mr. Abernathy. And then [Inv.] Summerford has to say, well, yeah, I interviewed a witness at the ER that was not recorded and then I interviewed the suspect at the sheriff's office, which should have been recorded. Then I think [defense counsel] asked him, well, was it recorded. And he said no.

"So now we're left sitting here with the jury aware that there was an interview with the suspect that was not recorded but at least in [Inv.] Summerford's memory. And it looks like we're hiding something now if we don't ask him what he asked Mr. Abernathy and what Mr. Abernathy had to say.

"So now we've been put in a position where I have to take it back. If [Inv.] Summerford testifies … to the voluntariness predicate and/or the <u>Miranda</u> predicate and Mr. Abernathy gave some kind of statement, I now think it needs to come in."

(R. 113-114.) After discussing the matter, the trial court ruled that, "now that it's been brought up, I think it's proper to get into." (R. 120.) The State said it would inquire about only "three lines of quoted statements from Abernathy" in a summary of the statement Abernathy made at the sheriff's office and not any statement he made at the hospital. (R. 120.) The trial court instructed Inv. Summerford that he could testify only

47

about direct statements Abernathy made to him—not about any summary of those statements. (R. 119.)

On further redirect, Inv. Summerford testified that he had interviewed Abernathy at the sheriff's office, that before the interview he had advised Abernathy of his <u>Miranda</u> rights, and that Abernathy had waived those rights. (R. 123-26.) The State then questioned Inv. Summerford about the statement:

> "Q. If you would, tell these ladies and gentlemen … what he told you about this incident.
>
> "A. He told us—again, this is a quote, 'I do not—or I don't know who I heard [sic].' He also stated, 'If I did, I'm sorry.' And I know before we left he told us, 'I believe what y'all say because you are police officers.'
>
> "Q. Okay. Anything else that you recall him specifically telling you?
>
> "A. I do recall asking him if he remembered anything about the pursuit, and he said he remembered being chased by blue lights.
>
> "Q. Anything about the parking in any of the area there?
>
> "A. Yes. … [H]e did say that he remembered parking the Ford Mustang he was driving in the tree line near the scene."

(R. 126-27.) Defense counsel briefly cross-examined Inv. Summerford about the statement.

On appeal, Abernathy asserts (1) that defense counsel did not "open the door" to the admission of the statement; (2) that the Miranda waiver and the statement were involuntarily made because, Abernathy says, he was under the influence of narcotics; (3) that the trial court erred in not holding a suppression hearing; and (4) that the quoted statements from Abernathy were an incomplete picture of the entire statement.

Defense counsel did not renew an objection to the statements, ask for a suppression hearing, or make any argument about the voluntariness of Abernathy's statement at the sheriff's office. Nor did defense counsel, despite cross-examining Inv. Summerford, explore the circumstances of the statements. Thus, any error in those matters was invited by defense counsel.[10] See, e.g., Lane v. State, 169 So. 3d 1076,

---

[10]As for Abernathy's assertion that defense counsel's questioning did not "open the door," that assertion lacks merit. See, e.g., Morgan v. State, 589 So. 2d 1315, 1320-21 (Ala. Crim. App. 1991) ("The appellant cannot complain about exploration of an issue which the appellant injected into trial. Morgan v. State, 440 So. 2d 1240 (Ala. Cr. App. 1983). 'Where a matter has been gone into by one party to a cause, the other party has the right to explain away anything, if he can, that may have been brought out to his detriment.' Wyrick v. State, 409 So. 2d 969, 975 (Ala. Cr. App. 1981), cert. denied, 409 So. 2d 969 (Ala. 1982). A defendant is not permitted to present evidence to the jury on a specific issue and object when the state attempts to introduce evidence on the same point. Billingsley v. State, 402 So. 2d 1052 (Ala. Cr. App. 1980), rev'd on other grounds, 402 So. 2d 1060 (Ala. 1981), cert. denied, 465 U.S. 1023, 104 S.

1110 (Ala. Crim. App. 2013) ("Additionally, it was defense counsel who caused the initial hearing to be postponed. Thus, if any error did occur, it was invited by defense counsel's actions. 'Invited error applies in death-penalty cases and operates to waive the error unless the error rises to the level of plain error.' Boyle v. State, 154 So. 3d 171, 187 (Ala. Crim. App. 2013), citing Williams v. State, 710 So. 2d 1276, 1316 (Ala. Crim. App. 1996)."), judgment vacated on other grounds, 577 U.S. 802 (2015).

We also hold that there was no plain error in the admission of Abernathy's statements. Inv. Summerford's testimony about the circumstances of the statements and Abernathy's waiver of his Miranda rights showed that Abernathy's statements were voluntarily made and thus admissible. See Davis v. State, 728 So. 2d 192, 195 (Ala. Crim. App. 1992). Abernathy's statements about being at the scene of the crash and seeing blue lights were cumulative to other evidence at trial. And given the overwhelming evidence of Abernathy's guilt, any error in the admission of his statements was harmless beyond a reasonable doubt. Abernathy is due no relief on this issue.

---

Ct. 1276, 79 L. Ed. 2d 681 (1984).").

## VII. PURPORTED VICTIM-IMPACT EVIDENCE DURING THE GUILT PHASE

Abernathy argues that the trial court erred by allegedly permitting victim-impact evidence during the guilt phase. (Abernathy's brief, p. 68.) He asserts that "the State repeatedly introduced irrelevant evidence concerning the victims' lives before the incident, the nature of their relationships, their shared adversity, and their health conditions. The State then made this evidence a central feature of its case."[11] (Id.) Abernathy preserved nothing for review, and we thus review this issue for plain error.[12] We find none. See, e.g., Ex parte Rieber, 663 So. 2d 999,

---

[11]For example, Abernathy cites evidence about Hamilton's health problems, including her need for dialysis, her vision problems, and her use of a service dog; evidence suggesting that Duffe had diabetes and had suffered a stroke; and evidence about McClung's caring for the home and Duffe's ex-husband while he was on hospice care. Abernathy also cites the State's introduction of "lifetime" photographs of the victims and the State's analogizing the victims to the characters in the movie Steel Magnolias.

[12]Abernathy objected to the introduction of one "lifetime" photo of each victim. He argued that the photos were irrelevant and cumulative, not that the photos were improper victim-impact evidence.

During the cross-examination of defense witness Stephanie Benefield, the prosecutor asked Benefield if she knew Hamilton's parents, who were in the courtroom. Benefield replied that she did. The prosecutor asked if she knew that Hamilton could not travel because she requires dialysis, and Benefield replied that she did. The prosecutor then

1006 (Ala. 1995); <u>Russell v. State</u>, 272 So. 3d 1134, 1165 (Ala. Crim. App.

2017); <u>Shanklin v. State</u>, 187 So. 3d 734, 781-82 (Ala. Crim. App. 2014).

## VIII. ADMISSION OF THE RECORDING OF McCLUNG'S 911 CALL

Abernathy asserts that the trial court erred in admitting the 17-minute recording of McClung's 911 call into evidence. (Abernathy's brief, p. 72.) He asserts that much of the recording was unduly prejudicial and included impermissible comments on Abernathy's intent. Because Abernathy did not object to the admission of the recording, we review this issue for plain error.

Abernathy asserts that statements McClung made—such as "he's gonna kill her now," "he may still come back in here and kill me," "he may come back here and finish me off," and "he's coming back and kill me"—were "speculative statements that concerned the ultimate issue in this case" and "could confusingly appear to the jury to have heightened value as to Mr. Abernathy's intent at the time of the shooting though they are

---

asked if Benefield knew that Hamilton is blind. Abernathy objected, stating, "We're getting far afield from the nature of her testimony." The trial court sustained Abernathy's objection. On appeal, Abernathy asserts that the trial court also should have instructed the jury to disregard the testimony and given the jury a limiting instruction.

52

actually expressions of Mr. McClung's fear."[13] (Abernathy's brief, p. 73.).

In the recording, McClung, immediately after he had been shot and had seen Abernathy take Hamilton away at gunpoint, reports to law-enforcement personnel what he perceives is happening or about to happen. McClung's statements were admissible as present-sense impressions and as excited utterances under Rule 803, Ala. R. Evid. They also were admissible as part of the res gestae of the offenses, see, e.g., State v. Martin, 562 So. 2d 468, 472-73 (La. Ct. App. 1990), and they explained the actions of law-enforcement officers in responding to the crimes. What's more, many of McClung's statements in the recording were cumulative to McClung's testimony and Hamilton's testimony. See, e.g., Brown v. State, 74 So. 3d 984, 1000 (Ala. Crim. App. 2010) ("'[Evidence] that may be inadmissible may be rendered harmless by

---

[13]Rule 704, Ala. R. Evid., which prohibits "[t]estimony in the form of an opinion or inference … if it embraces an ultimate issue to be decided by the trier of fact," does not apply to the recording of the 911 call, which did not involve sworn testimony. Cf. Jackson v. State, 169 So. 3d 1, 107 (Ala. Crim. App. 2010) ("As to Jackson's claim that the recording of the 911 call violated his confrontation rights, this claim lacks merit, because the call was not testimonial. … The 911 call in this case was made to provide information to enable police to respond to a perceived ongoing emergency. Therefore, the call was not testimonial and its admission did not run afoul of Jackson's rights to confrontation.").

prior or subsequent lawful testimony to the same effect or from which the same facts can be inferred.' White v. State, 650 So. 2d 538, 541 (Ala. Crim. App. 1994), overruled on other grounds, Ex parte Rivers, 669 So. 2d 239 (Ala. Crim. App. 1995). Because the portions of the transcript were cumulative to the testimony of Blankenship and Washington, error, if any, in the reading of the transcript was harmless. See Rule 45, Ala. R. App. P.").

Finally, the danger of unfair prejudice did not substantially outweigh the probative value of the recording of the 911 call. See Rule 403, Ala. R. Evid. We find no plain error.

## IX. ALLEGEDLY IMPROPER CHARACTER EVIDENCE DURING McCLUNG'S TESTIMONY

Abernathy asserts that "the State elicited testimony alleging Mr. Abernathy had engaged in prior acts of violence against Jerrica Hamilton as well as evidence of his bad character that was irrelevant to any issue at trial." (Abernathy's brief, p. 80.) He argues that "[t]he trial court's failure to exclude this evidence and issue proper curative instructions constitutes reversible error." (Id.).

During McClung's testimony, when the prosecutor stated, "we've heard some testimony that there was difficulties about who was going to

have the child when," McClung interjected that Hamilton "had a restraining order on him." (R. 161.) The prosecutor then asked, "My question is: Was the baby there that night?," to which McClung replied, "No. No." (R. 161.)

A few moments later, the prosecutor asked McClung, "There's been some testimony about a firearm in the house …. Do you recall that? Was there a gun in the house?" McClung replied, "Yeah. … Jerrica set it on the entertainment center. It was for Donnie—when Donnie came. She had a restraining order on him. And she said, when he comes …." (R. 162-63.) At that point, defense counsel raised a hearsay objection, which the trial court sustained. After McClung finished testifying but before the next witness began testifying, defense counsel stated:

> "Your Honor, before you get underway, during Mr. McClung's testimony there was something elicited—well, no, it wasn't elicited, it was volunteered, about a restraining order. We ask that the Court ask the jury to disregard that and … to strike that part of his testimony. That would obviously be prejudicial and subject to a [Rule] 404(b) notice if it was meant to be introduced. I don't think the State meant to introduce it. It just came out of his testimony.
>
> "[PROSECUTOR]: No objection to that being stricken from the record, Judge.
>
> "THE COURT: All right. Ladies and gentlemen, in Mr. McClung's testimony he mentioned something of a

55

restraining order. There's no evidence in this case that would be introduced to the restraining order, and so you are not to consider that as part of the evidence."

(R. 168.)

On appeal, Abernathy argues that the trial court's limiting instruction was "inadequate," and he argues that the evidence about the gun and the restraining order requires reversal. We review this issue for plain error. There is none.

First, the trial court granted Abernathy's request for a limiting instruction, and we presume that the jury followed the trial court's clear instruction not to consider the testimony about the restraining order. See, e.g., Eaton v. State, 759 So. 2d 562, 564 (Ala. Crim. App. 1999); Thompson v. State, 153 So. 3d 84, 158 (Ala. Crim. App. 2012).

Second, assuming the testimony could be classified as Rule 404(b) evidence, it did not rise to the level of plain error. The State did not elicit information about a supposed restraining order, and the State agreed to the trial court's giving a limiting instruction about it. And the State did not elicit testimony about the purpose of the gun, and Abernathy did not object to that testimony. Considering the evidence as a whole, McClung's brief reference to the gun's being for protection from Abernathy could not

have influenced the jury's verdict, and it did not seriously affect the fairness and integrity of the proceedings. See Rule 45A, Ala. R. App. P. That is particularly so given the overwhelming evidence of Abernathy's guilt. See Yeiter v. State, [Ms. SC-2022-0417, Sept. 2, 2022] ___ So. 3d ___, ___ (Ala. 2022) ("The evidence of Yeiter's guilt was virtually ironclad and so overwhelming that the prior-bad-acts evidence could not reasonably have affected the outcome of Yeiter's trial.").

X.  ALLEGED AMENDMENT OF THE CAPITAL-MURDER-DURING-A-FIRST-DEGREE-KIDNAPPING CHARGE

Count 2 of the indictment in case no. CC-16-256 reads:

"The Grand Jury of [Cherokee] County further charges that before the finding of this Indictment, DONNIE LEE ABERNATHY … did, with the intent to cause the death of another person, cause the death of that person or another person, to-wit: Sylvia Sue Duffe, Clara Lee Edwards and Pamela Collette Oshel, by shooting them with a gun, and the said Donnie Lee Abernathy caused said death during his abduction or attempt to abduct another person, to-wit: Jerrica Hamilton, with the intent to inflict physical injury upon her or to violate her or to abuse her sexually, in violation of Section § 13A-5-40(a)(1) of the Code of Alabama."

(C. 2158.) Section 13A-5-40(a)(1), Ala. Code 1975, provides: "Murder by the defendant during a kidnapping in the first degree or an attempt thereof committed by the defendant" is a capital offense. Section 13A-6-43(a), Ala. Code 1975, provides:

"(a) A person commits the crime of kidnapping in the first degree if he abducts another person with intent to

"(1) Hold him for ransom or reward; or

"(2) Use him as a shield or hostage; or

"(3) Accomplish or aid the commission of any felony or flight therefrom; or

"(4) Inflict physical injury upon him, or to violate or abuse him sexually; or

"(5) Terrorize him or a third person; or

"(6) Interfere with the performance of any governmental or political function."

Although it did not cite the code section, the indictment used language from § 13A-6-43(a)(4)—"Inflict physical injury upon [her], or to violate [her] sexually."

The trial court began its instructions to the jury by reading the indictments. (R. 449.) The trial court then instructed the jury about the offenses. As to the charge of capital murder during a first-degree kidnapping, the trial court stated:

"Count two, the defendant is charged with capital murder. The law states that an intentional murder committed during a kidnapping in the first degree or an attempt thereof is capital murder. A person commits an intentional murder if he causes the death of another person, and in performing the act or acts that caused the death of that person, he intends to

kill that person or another person.

"A person commits kidnapping in the first degree if he abducts another person with the intent to, one, hold that person for ransom or reward or, two, use that person as a shield or hostage or, three, accomplish or aid the commission of any felony or flight therefrom or, four, inflict physical injury upon that person or to violate or abuse that person sexually or, five, to terrorize that person or a third person or, six, interfere with the performance of any governmental or political function.

"To convict, the State must prove beyond a reasonable doubt each of the following elements of an intentional murder during kidnapping in the first degree: That Sylvia Sue Duffe, Clara Lee Edwards, and Pamela Collette Oshel are dead; that the defendant caused the death of Sylvia Sue Duffe, Clara Lee Edwards, and Pamela Collette Oshel by shooting each of them; that in committing the acts that caused the death of Sylvia Sue Duffe, Clara Lee Edwards, and Pamela Collette Oshel, the defendant intended to kill the deceased or another person; that the defendant committed or attempted to commit kidnapping in the first degree; and that the murder took place during the kidnapping."

(R. 457-59.) During its deliberations, the jury sent a question to the trial court: "On this sheet, do we choose just one? Capital murder during a kidnapping in the first degree, not guilty, guilty; lesser included offense of murder, not guilty, guilty." (R. 473.) After discussions with the attorneys, the trial court reread the above instruction, which was based on the statutory language, to the jury, along with rereading its instructions about the lesser-included offense. (R. 480.)

Abernathy argues that, because the trial court used language based on all of § 13A-6-43(a) in its instructions—rather than just § 13A-6-43(a)(4), the trial court "improperly amended the indictment for capital murder during a first-degree kidnapping." (Abernathy's brief, p. 28.) Abernathy asserts that, "[a]s a result, the trial court diminished the State's burden of proof with respect to the charge of capital murder during a kidnapping, rendered it impossible to know the statutory element upon which the jury based its verdict, and deprived Mr. Abernathy of fair notice of the charges against him." (Id.) In support of his position, Abernathy relies on cases such as Stirone v. United States, 361 U.S. 212 (1960), McKinnis v. State, 99 So. 3d 1265 (Ala. Crim. App. 2012), Williams v. State, 701 So. 2d 832 (Ala. Crim. App. 1997), Styles v. State, 474 So. 2d 185 (Ala. Crim. App. 1985), and House v. State, 380 So. 2d 940 (Ala. Crim. App. 1979). He contends that the trial court's instructions violated Rule 13.5(a), Ala. R. Crim. P., which prohibits amending "[a] charge … except to change the offense or to charge new offenses not contemplated by the original indictment."

Abernathy did not object to the instructions or raise this issue in the trial court. We thus review it for plain error.

60

"When reviewing a trial court's jury instructions, we keep in mind the following:

> """'A trial court has broad discretion in formulating its jury instructions, providing those instructions accurately reflect the law and the facts of the case. <u>Raper v. State</u>, 584 So. 2d 544 (Ala. Cr. App. 1991). We do not review a jury instruction in isolation, but must consider the instruction as a whole, <u>Stewart v. State</u>, 601 So. 2d 491 (Ala. Cr. App. 1992), aff'd in relevant part, 659 So. 2d 122 (Ala. 1993), and we must evaluate instructions like a reasonable juror may have interpreted them. <u>Francis v. Franklin</u>, 471 U.S. 307, 105 S. Ct. 1965, 85 L. Ed. 2d 344 (1985); <u>Stewart v. State</u>.'"

"'<u>Griffin v. State</u>, 790 So. 2d 267, 332 (Ala. Crim. App. 1999), quoting <u>Ingram v. State</u>, 779 So. 2d 1225, 1258 (Ala. Crim. App. 1999). "This court has consistently held that a trial court's oral charge to the jury must be viewed in its entirety and not in 'bits and pieces.' <u>Parks v. State</u>, 565 So. 2d 1265 (Ala. Cr. App. 1990); <u>Williams v. State</u>, 538 So. 2d 1250 (Ala. Cr. App. 1988); <u>Lambeth v. State</u>, 380 So. 2d 923 (Ala.), on remand, 380 So. 2d 925 (Ala. Cr. App. 1979), writ denied, 380 So. 2d 926 (Ala. 1980)." <u>Smith v. State</u>, 585 So. 2d 223, 225 (Ala. Crim. App. 1991).'

"<u>Smith v. State</u>, 908 So. 2d 273, 295 (Ala. Crim. App. 2000), cert. quashed, 908 So. 2d 302 (Ala. 2005), cert. denied, <u>Smith v. Alabama</u>, 546 U.S. 928, 126 S. Ct. 148, 163 L. Ed. 2d 277 (2005).

> """A trial court has broad discretion in formulating
> its jury instructions, providing those instructions
> accurately reflect the law and the facts of the case."
> Ingram v. State, 779 So. 2d 1225 (Ala. Crim. App.
> 1999) (citing Raper v. State, 584 So. 2d 544 (Ala.
> Crim. App. 1991)). Moreover, this Court does not
> review jury instructions in isolation, instead we
> consider the instruction as a whole. Stewart v.
> State, 601 So. 2d 491 (Ala. Crim. App. 1992).'

> "Living v. State, 796 So. 2d 1121, 1130-31 (Ala. Crim. App.
> 2000)."

Whatley v. State, 146 So. 3d 437, 468-69 (Ala. Crim. App. 2010).

Three of the Alabama decisions that Abernathy relies on—

McKinnis, Williams, and Styles—involved situations in which the

indictment named as the victim a specific person or persons but the trial

court's instructions to the jury permitted the jury to convict the defendant

as to a different person or persons not named in the indictment. See

McKinnis, 99 So. 3d at 1282 ("Because McKinnis could have been charged

and convicted separately for two counts of capital murder during a

robbery based on the two separate robberies of Conaway and Belser, but

he was indicted for only one of those robberies—the robbery of

Conaway—the trial court's instructions to the jury that it could find

McKinnis guilty of capital murder during a robbery if it found that

McKinnis robbed either Conaway or Belser, improperly amended the

indictment to add an additional charge not contemplated by the original indictment—the robbery of Belser—and clearly violated the prohibition in Rule 13.5(a), Ala. R. Crim. P."); Williams, 701 So. 2d at 833 ("It is clear that in order for the jury to convict Williams of the offense charged in the indictment, the jury would have to have found him guilty of robbing both alleged victims. … It is equally clear that if the jury followed the trial court's instruction, it could have found Williams guilty based on the robbery of either of the alleged victims."); Styles, 474 So. 2d at 188 (similar issue as in Williams).[14]

"First-degree kidnapping requires an abduction coupled with one of six enumerated 'goals of criminal intent,' Smith v. State, 838 So. 2d 413, 468-69 (Ala. Crim. App. 2002)," as set forth in § 13A-6-43(a)(1) through (6). Davis v. State, 42 So. 3d 162, 168 (Ala. Crim. App. 2009). The trial court's instructions, which tracked the statutory language for first-degree

---

[14]Another Alabama decision cited by Abernathy—Wright v. State, 902 So. 2d 738 (Ala. 2004)—involved a related issue. In Wright, the defendants were indicted for first-degree robbery but were each convicted of second-degree robbery as a lesser-included offense. Applying Ex parte Cole, 842 So. 2d 605 (Ala. 2002), the Alabama Supreme Court held that the trial court had no subject-matter jurisdiction over second-degree-robbery charges because the original indictments did not allege that the defendants might have been aided by another individual rather than acting alone. Wright does not apply to Abernathy's case.

kidnapping, did not change who the victim was—Jerrica Hamilton. And the trial court's instructions did not amend the indictment to charge a different offense—that offense was first-degree kidnapping of Jerrica Hamilton. We are thus not persuaded that McKinnis, Williams, or Styles apply here.

The trial court's instruction on first-degree kidnapping also did not impermissibly broaden the indictment or create a substantial likelihood that Abernathy would be convicted of an uncharged offense. See Ex parte Phillips, 287 So. 3d 1179, 1221 (Ala. 2018) ("A constructive amendment of an indictment occurs when the terms of the indictment are altered by evidence or jury instructions that modify the essential elements of the charged offense, thereby establishing a substantial likelihood that the defendant was convicted of an offense other than the offense charged in the indictment.").

"It is also crucial to examine the court's instructions in the light of the trial itself." United States v. Andrews, 850 F.2d 1557, 1559 (11th Cir. 1988). The State's theory from the beginning was that Abernathy entered the home with the intent to abduct Hamilton to harm or kill her. (R. 31.) See Andrews, 850 F.2d at 1559 ("The Record clearly reveals that the

government's evidence and arguments targeted the alleged conspiracy between Ford and Andrews; never did the government attempt to show that Andrews conspired with some other person allegedly present at the scene of the crime."); State v. Weaver, 957 So. 2d 586, 589 (Fla. 2007) ("Because bodily harm was never at issue in Weaver's case, and the State never argued or presented evidence of bodily harm, the trial court's inclusion of the bodily harm element in the jury instructions did not rise to the level of fundamental error."); cf. McKinnis, 99 So. 3d at 1282 ("[T]he record here reflects that the State's case at the guilt phase of the trial was not presented in such a fashion as to specifically distinguish Conaway as the victim of the robbery charged and Belser as the victim of the murder charged. Rather, throughout the trial, the prosecutor referred to Belser as the victim of the crime generally and to Conaway simply as the owner of the club. Indeed, the focus of the State's case was on McKinnis's intent to kill, not on the robbery element of the crime.").

In closing, the prosecutor listed the elements of all the charged offenses, stating in part: "Number four, that the defendant, in connection to or during these murders, abducted Jerrica Hamilton with the intent to inflict physical injury upon her." (R. 395.) He then argued how the

evidence had proven the capital-murder-during-a-kidnapping charge, stating that Abernathy "[j]ust got through killing the three relatives … and then puts a gun to her head said, you'll go. You'll die here or you'll die later and marches her out of the house." (R. 397.)

Finally, the jury's verdict read, "We, the jury, find the defendant, Donnie Lee Abernathy, guilty of the offense of capital murder during a kidnapping in the first degree <u>as charged in the indictment</u>." (R. 487 (emphasis added).)

The State presented no evidence or argument about the other "goals of criminal intent" listed in § 13A-6-43(a), and the evidence of Abernathy's criminal intent to inflict physical injury upon Hamilton, <u>see</u> § 13A-6-43(a)(4), was overwhelming and virtually ironclad. No plain error occurred, and Abernathy is due no relief on this issue.

## XI. INSTRUCTIONS ON LESSER-INCLUDED OFFENSES

Abernathy argues that the trial court should have instructed the jury on felony murder as a lesser-included offense to the capital-murder charges.[15] (Abernathy's brief, p. 19.)

---

[15]In a footnote, Abernathy argues that the trial court should have instructed the jury on first-degree assault as a lesser-included offense of attempted murder. (Abernathy's brief, p. 21 n.7.) But Abernathy did not

66

At the charge conference, defense counsel requested a "charge on noncapital murder," and the State objected, arguing that there was "no reasonable theory of the evidence that would give rise to a lesser" offense. (R. 375.) In response, defense counsel stated:

> "Our argument would be that even if you have a circumstance that appears to be inescapable, you know, the fact that there were two or greater deaths, … it doesn't make that capital murder necessarily. You still have to prove the further element of specific intent to kill.
>
> "So … you have a situation where any capital murder allegation wherein there's a failure to prove that extra level of specific intent would necessarily default back to … a noncapital murder, even if … there were multiples, even if the victim were under 12, even if any of those other circumstances that appear as if, well, this is capital and only capital. If there's a failure of specific intent to be proven, then you're dealing with just an ordinary murder."

(R. 376.) The Court then stated:

> "So … the pattern jury instructions for what we would call ordinary murder, are you getting to the extreme indifference

---

ask for such an instruction, and, because plain-error review does not apply to that conviction and sentence, the claim is not preserved for appellate review. See, e.g., Ex parte Woodall, 730 So. 2d 652, 665 (Ala. 1998). Other than that claim, Abernathy raises no issues about his convictions and sentences for attempted murder, first-degree criminal mischief, and attempting to elude, although he did include those convictions on his notice of appeal. Thus, we do not address those convictions or sentences. See, e.g., Brownlee v. State, 666 So. 2d 91, 93 (Ala. Crim. App. 1995) ("We will not review issues not listed and argued in brief.").

67

to human life? Because … intent is still an element … under [§] 13A-6-2(a)(1)[, Ala. Code 1975]. You go to (a)(2), you start to get into the extreme indifference to human life …. Is that what you're getting at?

(R. 376-77.) Defense counsel replied:

"Right. In other words, I'm not thinking extreme indifference. I'm thinking, you know, we've got two murders—and two murder varieties, I guess you would say. And we have … what I guess we would call ordinary murder where it must be intentional or it's some other variety of homicide.

"But there's a difference with respect to capital murder. It's not just the—the intent that we have for—for the ordinary murder statute. It's called specific intent. And, in fact, in the jury instructions, the specific intent, I believe, is like it must be real and it must be specific. That's something other than the ordinary state of mind for noncapital murder."

(R. 377-78.)

After a brief recess, the trial court stated it would instruct on a lesser-included offense for the capital-murder-during-a-kidnapping count but not on the other capital-murder count. (R. 380.) Defense counsel stated, "Just based on our argument before, just if the Court would show that that's over our objection." (R. 381.) The trial court clarified that defense counsel's objection was to the trial court's refusal to instruct the jury on lesser-included offenses as to the capital-murder-of-two-or-more-

persons charge.[16] (R. 381.) The trial court then gave copies of its instructions to the parties, and defense counsel stated: "We're satisfied that these are acceptable, Your Honor." (R. 381.)

As a lesser-included offense on the capital-murder-during-a-kidnapping charge, the trial court instructed the jury on noncapital murder, reading the elements for intentional and reckless murder under § 13A-6-2(a)(1) and (2), Ala. Code 1975. (R. 459-61.)

Abernathy asserts that defense counsel made an "explicit request not to instruct on reckless murder." (Abernathy's brief, p. 21.) Yet the record does not support that claim. Rather, the record shows that defense counsel requested charges on "non-capital murder" and that counsel did not specifically request that the trial court charge the jury on felony murder.

In Thompson v. State, 153 So. 3d 84, 155-56 (Ala. Crim. App. 2012), this Court stated:

> "'A defendant is entitled to a charge on a lesser-included offense only if there is any reasonable theory from the

---

[16]Abernathy describes defense counsel as "explicitly indicat[ing]" that counsel was not requesting a charge on reckless murder. (Abernathy's brief, p. 27.) Yet the record does not show that defense counsel "explicitly" opposed the giving of that charge. Indeed, counsel stated that he was satisfied with the charges. (R. 381.)

evidence to support the charge. <u>Ex parte Smith</u>, 756 So. 2d 957, 963 (Ala. 2000).' <u>Pilley v. State</u>, 930 So. 2d 550, 562 (Ala. Crim. App. 2005).

> "'A trial court may refuse to charge on a lesser-included offense only when: (1) it is clear to the judicial mind that there is no evidence tending to bring the offense within the definition of the lesser offense; or (2) the charge would tend to mislead or confuse the jury. <u>Turner v. State</u>, 708 So. 2d 232, 234 (Ala. Crim. App. 1997) (citing <u>Holladay v. State</u>, 549 So. 2d 122 (Ala. Crim. App. 1988)).'

"<u>McClain v. State</u>, 26 So. 3d 491, 495 (Ala. Crim. App. 2009).

> "Where the evidence will support a charge on the offense of capital murder, a charge on the lesser-included offense of felony murder is warranted only if a reasonable theory of the evidence indicates that the murder may not have been intentional. <u>See, e.g.</u>, <u>Peoples v. State</u>, 951 So. 2d 755, 758 (Ala. Crim. App. 2006) ('"'[F]elony murder does not require intent to kill; the only intent necessary is the intent to commit the underlying felony.'"' (citations omitted)); <u>Calhoun v. State</u>, 932 So. 2d 923, 969 (Ala. Crim. App. 2005). In the present case, there was no reasonable theory of the evidence that indicated that the murders were not intentional. Nor was there any evidence that the taking of the gun and the killings were not committed pursuant to one course of conduct.

> "There was no rational basis to support a conviction on any lesser-included offense."

As this Court did in <u>Thompson</u>, we have no problem concluding that the trial court should not have instructed the jury on felony murder. "The crime of felony murder is reserved for those situations where an

unintended death occurs as a result of a defendant's dangerous conduct."

Calhoun v. State, 932 So. 2d 923, 969 (Ala. Crim. App. 2005).

There was no reasonable theory of the evidence that Abernathy did not intend to shoot and kill Oshel, Edwards, and Duffe. The evidence showed that he parked his car off the road in the woods about six-tenths of a mile from Duffe's home. He entered the home armed with a revolver and found where Hamilton was sleeping. He attempted to awaken Hamilton and kidnap her, but when Oshel woke up and reached for her cell phone, Abernathy shot her twice—once in the chest and once in the back—killing her.

Hamilton ran to Duffe's room, and Abernathy exited Oshel's room into the den, where Edwards had been sleeping, and shot Edwards twice—once in the chest and once in the shoulder—killing her. Abernathy then entered Duffe's bedroom and shot her three times—once in the chest, once in the shoulder, and once in the back—killing her. He then reloaded his revolver and drug Hamilton from Duffe's bedroom, where he was met by McClung. Seeing that Abernathy had a gun, McClung turned around to run, and Abernathy shot him once in the back. McClung heard Abernathy tell Hamilton that "if she didn't go with him, he was going to

71

kill her like the rest of [them]." (R. 158.) As in Calhoun, "the manner of the killing[s] … showed that the murder[s] [were] intentional. The circuit court did not err in failing to instruct the jury on felony murder." 932 So. 2d at 969-70. Abernathy is due no relief on this issue.

## PENALTY-PHASE ISSUES

## XII.  WAIVER OF THE JURY'S PARTICIPATION

Abernathy argues that the trial court erred in accepting his "waiver of the jury at the penalty phase of [his] trial." (Abernathy's brief, p. 85.) Because Abernathy requested the waiver, there is no adverse ruling before us. Thus, we review this issue only for plain error.

Section 13A-5-44(c), Ala. Code 1975, provides:

"Notwithstanding any other provision of law, the defendant with the consent of the state and with the approval of the court may waive the participation of a jury in the sentence hearing provided in Section 13A-5-46[, Ala. Code 1975]. Provided, however, before any such waiver is valid, it must affirmatively appear in the record that the defendant himself has freely waived his right to the participation of a jury in the sentence proceeding, after having been expressly informed of such right."

"'When determining the validity of any waiver we look at the particular facts of the case and the totality of the circumstances.'" Osgood v. State, 341 So. 3d 170, 218 (Ala. Crim. App. 2016) (quoting Turner v. State, 924

So. 2d 737, 782 (Ala. Crim. App. 2002)).

> "In <u>Peraita v. State</u>, 897 So. 2d 1161 (Ala. Crim. App. 2003), this Court addressed a similar situation and held that a defendant had freely waived his right to the participation of the jury in the sentencing phase of his capital murder trial when the court 'thoroughly explained the rights that [the defendant] would be waiving,' 'questioned [the defendant] extensively about his decision and his understanding of the consequences thereof,' and the defendant 'remained adamant about his decision to waive jury participation.' 897 So. 2d at 1197."

<u>Osgood</u>, 341 So. 3d at 218.

Defense counsel told the trial court that Abernathy wanted to waive the jury's participation in sentencing:

> "Your Honor, we—having talked to Mr. Abernathy about the possibility that the conviction would be for capital murder, we looked ahead and have opted to request that the Court do the sentencing, waive jury sentencing. The State, I believe, is prepared to consent to that. And the last piece of the puzzle is your approval that we go to sentencing before the Court, rather than the advisory verdict, and—and then sentencing by the Court."

(R. 491.) After confirming that the State consented to the waiver, the trial court questioned Abernathy:

> "THE COURT: … Mr. Abernathy, let me ask you: Your lawyers have indicated that you have agreed to waive your right, which you do have a right, … to present sentencing mitigating evidence to the jury and have them make a recommendation. It's an advisory recommendation on sentencing to me.

"Understand that my reading of the law is that we are still under a prior law that would still allow me the final authority on whether to give you, on the capital cases, a sentence of death or a sentence of life in prison without parole. The jury would advise me in that, and then I would make the final decision.

"Your lawyers have indicated to me, that after discussions with you, that they're asking to forgo the advisory recommendation of the jury and just have a sentencing hearing before me and allow me the final say. Is that, in fact, what you're asking me to do?

"MR. ABERNATHY: Yes, sir.

"THE COURT: And you understand that once we get to that point, if I excuse the jury, I can't bring them back, that … if you consent to this today, that I will excuse the jury and that the sentencing hearing tomorrow morning would be only in front of me and that it would be my decision as to whether to give you life in prison without parole or the sentence of death?

"MR. ABERNATHY: Yes, sir.

"THE COURT: Okay. Do you need any additional time to talk to your lawyers about this before I excuse the jury?

"MR. ABERNATHY: No, sir.

"THE COURT: Do you feel like you understand what you're doing?

"MR. ABERNATHY: Yes, sir.

"THE COURT: Do you feel like anybody is pressuring you or forcing you to forgo the advisory recommendation of the

jury?

"MR . ABERNATHY: No, sir.

"THE COURT: This is—this is what you want to do based on your discussions with your lawyer and the facts of this case?

"MR . ABERNATHY: Yes, sir.

"THE COURT: Okay. All right. Anything else, [defense counsel]?

"[DEFENSE COUNSEL]: No, sir.

"THE COURT: Okay. … I'll grant that request."

(R. 495-97.)

"Based on the record as a whole and the totality of the circumstances presented here, we conclude that the record affirmatively establishes that [Abernathy] was fully informed of his right to jury participation in the sentencing proceedings and that he subsequently freely waived his right to participation of the jury."

Osgood, 341 So. 3d at 226. Abernathy is due no relief on this issue.

## XIII. TRIAL COURT'S REFUSAL TO FIND THAT TWO STATUTORY MITIGATING CIRCUMSTANCES EXISTED

Abernathy asserts that "the trial court erroneously refused to find and consider" that two statutory mitigating circumstances existed—that Abernathy committed the offenses "while … under the influence of extreme mental or emotional disturbance," § 13A-5-51(2), Ala. Code 1975,

and that "the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired," § 13A-5-51(6), Ala. Code 1975. (Abernathy's brief, p. 74.) Abernathy argues that he presented the "substantial, unrebutted" testimony of Dr. Robert Shaffer, who opined that Abernathy "exhibited impaired executive functioning and that he was 'childlike,' 'slow in many ways,' and 'very low functioning,' possessing an IQ of 82." (Abernathy's brief, p. 75.) Dr. Shaffer opined that Abernathy "was unable to appropriately assess consequences and change course as his actions had negative outcomes." (Id.) Dr. Shaffer opined that Abernathy's impairment "was the result of childhood trauma in which Mr. Abernathy lost his eye at age 11," which he asserted "gave rise to post-traumatic stress disorder." (Id.)

The trial court's sentencing order shows that the trial court considered the evidence offered by Abernathy but that it did not find that the evidence showed the existence of the statutory mitigating circumstances in § 13A-5-51(2) and § 13A-5-51(6). The trial court noted, among other things, that Dr. Shaffer had testified that he did not have knowledge about Abernathy's mental state on the day of the murders. (C.

76

3195.) The trial court also cited Abernathy's actions on the night of the murders, which the trial court found showed "careful planning and thought processing." (C. 3197.)

Abernathy has not shown that the trial court erred in these conclusions. See, e.g., Stanley v. State, 143 So. 3d 230, 330-31 (Ala. Crim. App. 2012). He is due no relief on this claim.

## XIV.  ALLEGED REFUSAL TO "MEANINGFULLY CONSIDER" THE AGGRAVATING AND MITIGATING CIRCUMSTANCES

Abernathy argues that the trial court improperly weighed the aggravating and mitigating circumstances because, he asserts, "the trial court refused to meaningfully consider the mitigating evidence by finding no amount of mitigation could outweigh the aggravating circumstance of causing the death of two or more persons." (Abernathy's brief, p. 44.) Abernathy did not raise this issue in the trial court, and thus we review it for plain error.

Abernathy's argument hinges on two sentences of the trial court's sentencing order. First, in discussing the aggravating circumstance that Abernathy had murdered two or more people, the trial court stated: "In fact, this Court finds it very hard to imagine a combination of mitigating circumstances that could fairly and reasonably outweigh the value of

three innocent lives." (C. 3201.) Contrary to Abernathy's assertion, this sentence does not show that the trial court refused to consider his mitigation evidence. The trial court's order shows that it did consider that evidence but that the trial court did not give the evidence the weight Abernathy thinks it should have. That gives Abernathy no right to relief. Cf. Miller v. State, [Ms. CR-20-0654, Aug. 18, 2023] ___ So. 3d ___, ___ (Ala. Crim. App. 2023) ("The record shows that the circuit court considered Miller's youth and background mitigating but did not assign that evidence the weight Miller contends it should have. Miller has not shown that he is due relief.").

Second, in its conclusion, the trial court stated that Abernathy's "complete disregard for innocent life will not—in fact, it cannot—be met with leniency in this case." (C. 3203.) This sentence is an expression supporting the trial court's conclusion in the next sentence:

> "Accordingly, after great thought and consideration under the laws of this State, the testimony heard at trial and at the sentencing hearing, the pre-sentence investigation report, and in consideration of all other matters proffered before this Court, and with complete appreciation for the gravity of such a sentence, this Court has determined beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances."

(C. 3203.)

The record shows that the trial court evaluated the circumstances of the offense, Abernathy's evidence offered in mitigation, and the aggravating circumstances the State submitted. See Maples v. State, 758 So. 2d 1, 32-33 (Ala. Crim. App. 1999) ("The trial court allowed the appellant to present all of the mitigating evidence he wanted to present, and its sentencing order clearly indicates that it considered all of the mitigating evidence the appellant presented."); Phillips v. State, 287 So. 3d 1063, 1169 (Ala. Crim. App. 2015) ("[T]he trial court is required only to consider evidence presented as mitigation and has the discretion to decide whether a particular mitigating circumstance exists and what weight, if any, is to be given to that mitigating circumstance."). Abernathy is due no relief on this issue.

## XV. THIS COURT'S INDEPENDENT REVIEW

Under § 13A-5-53, Ala. Code 1975, this Court is required to address the propriety of Abernathy's capital-murder convictions and death sentence.

As discussed above, a jury convicted Abernathy of two counts of capital murder, one count for the murder of two or more persons pursuant to one scheme or course of conduct, see § 13A-5-40(a)(10), Ala. Code 1975,

and one count for murder during a first-degree kidnapping, see § 13A-5-40(a)(1), Ala. Code 1975. Abernathy waived his right to jury participation in sentencing on his capital-murder convictions, and, after a hearing, the trial court sentenced Abernathy to death for both capital convictions.

The record does not show that Abernathy's death sentence was imposed as the result of the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(1), Ala. Code 1975.

The trial court correctly found that the aggravating circumstances outweighed the mitigating circumstances. The trial court, in its sentencing order, found two aggravating circumstances to exist: (1) that Abernathy caused the death of two or more persons by one act or pursuant to one scheme or course of conduct, see § 13A-5-49(9), Ala. Code 1975, and (2) that Abernathy committed the murders during the course of a first-degree kidnapping, see § 13A-5-49(4), Ala. Code 1975. The trial court found that both aggravating circumstances weighed in favor of a death sentence and "place[d] the most weight on the fact that Abernathy intentionally killed two or more persons." (C. 3201.)

The trial court then considered each of the statutory mitigating circumstances and found one to exist—that Abernathy had no significant

history of prior criminal activity, see § 13A-5-51(1), Ala. Code 1975. The trial court gave that statutory mitigating circumstance "due weight." (C. 3195.) The trial court also considered the nonstatutory mitigating evidence Abernathy presented, and it found these nonstatutory mitigating circumstances to exist: that Abernathy had been a "model prisoner since his incarceration"; that Abernathy has "a below average level of intelligence and mental capabilities"; that Abernathy suffered "trauma—physical, mental, and emotional—from [his] eye injury [at age 11]"; that Abernathy had a "bad childhood," including a father who "was often absent and was abusive when present" and a mother who "suffered from mental issues that required in-patient mental health treatment"; that Abernathy had provided love and care to his minor children; and that "Abernathy's plea for mercy is well-taken." (C. 3197-3200.)

The trial court then weighed the statutory aggravating circumstances and the statutory and nonstatutory mitigating circumstances and concluded that it had "determined beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances." (C. 3203.) Thus, the trial court's amended sentencing order shows that it properly weighed the aggravating

81

circumstances and the mitigating circumstances and that it correctly sentenced Abernathy to death. The record supports these findings.

Section 13A-5-53(b)(2), Ala. Code 1975, requires this Court to reweigh the aggravating and mitigating circumstances to determine whether the death sentence is appropriate.

"'Section 13A-5-48, Ala. Code 1975, provides:

"'"The process described in Sections 13A-5-46(e)(2), 13A-5-46(e)(3) and Section 13A-5-47(e)[17] of weighing the aggravating and mitigating circumstances to determine the sentence shall not be defined to mean a mere tallying of aggravating and mitigating circumstances for the purpose of numerical comparison. Instead, it shall be defined to mean a process by which circumstances relevant to sentence are marshalled and considered in an organized fashion for the purpose of determining whether the proper sentence in view of all the relevant circumstances in an individual case is life imprisonment without parole or death.'

"'"The determination of whether the aggravating

---

[17]Act No. 2017-131, Ala. Acts 2017, amended § 13A-5-46(e)(2) and § 13A-5-46(e)(3), Ala. Code 1975, to make the jury's verdict no longer advisory, and the act removed § 13A-5-47(e), Ala. Code 1975, which placed the final sentencing decision with the trial court. The decision in Stanley v. State, 143 So. 3d 230 (Ala. Crim. App. 2012), applied the versions of those subsections in effect before the 2017 amendment, and those versions in effect before 2017 apply to Abernathy's case because he was charged before the effective date of the 2017 act. See Yeiter v. State, [Ms. CR-18-0599, June 28, 2024] ___ So. 3d ___, ___ (Ala. Crim. App. 2024).

circumstances outweigh the mitigating circumstances is not a numerical one, but instead involves the gravity of the aggravation as compared to the mitigation.' Ex parte Clisby, 456 So. 2d 105, 108-09 (Ala. 1984). '[W]hile the existence of an aggravating or mitigating circumstance is a fact susceptible to proof, the relative weight of each is not; the process of weighing, unlike facts, is not susceptible to proof by either party.' Lawhorn v. State, 581 So. 2d 1159, 1171 (Ala. Crim. App. 1990) .... 'The weight to be attached to the aggravating and the mitigating evidence is strictly within the discretion of the sentencing authority.' Smith v. State, 908 So. 2d 273, 298 (Ala. Crim. App. 2000)."

Stanley, 143 So. 3d at 333. We agree with the trial court's findings, and, after independently weighing the aggravating circumstances and the mitigating circumstances, this Court holds that Abernathy's death sentence is appropriate.

Under § 13A-5-53(b)(3), Ala. Code 1975, this Court holds that sentencing Abernathy to death is not excessive or disproportionate when compared to the penalty imposed in similar cases. See, e.g., Knight v. State, 300 So. 3d 76, 132 (Ala. Crim. App. 2018) (imposing death sentence for capital murder during a first-degree kidnapping); Phillips, 287 So. 3d at 1178-79 (imposing death sentence for capital murder of two or more persons pursuant to one act or one scheme or course of conduct).

Finally, although we are no longer required to do so by Rule 45A, Ala. R. App. P., we have reviewed the record and have found no plain

error that may have adversely affected Abernathy's substantial rights.[18]

## CONCLUSION

The judgment of the trial court is affirmed.

AFFIRMED.

Windom, P.J., and Kellum and Anderson,* JJ., concur. Cole, J., concurs in the result.

---

[18]Although we have not specifically addressed Issues II, XI, XIII, or XVII as listed in Abernathy's brief, we find no plain error as to those issues.

*Although Judge Anderson was not a member of the Court when the case was orally argued, he has reviewed the video recording of the oral argument.